# ARIZONA ET AL. *v.* WASHINGTON

No. 76–1168.   Argued October 31, 1977—Decided February 21, 1978

*Stephen D. Neely* argued the cause and filed a brief for petitioner.

*Ed Bolding* argued the cause for respondent. With him on the brief was *Frederick S. Klein.*

MR. JUSTICE STEVENS delivered the opinion of the Court.

An Arizona trial judge granted the prosecutor's motion for a mistrial predicated on improper and prejudicial comment during defense counsel's opening statement. In a subsequent habeas corpus proceeding, a Federal District Court held that the Double Jeopardy Clause protected the defendant from another trial. The Court of Appeals for the Ninth Circuit affirmed.[1] The questions presented are whether the record reflects the kind of "necessity" for the mistrial ruling that will avoid a valid plea of double jeopardy, and if so, whether the plea must nevertheless be allowed because the Arizona trial judge did not fully explain the reasons for his mistrial ruling.

## I

In 1971 respondent was found guilty of murdering a hotel night clerk. In 1973, the Superior Court of Pima County, Ariz., ordered a new trial because the prosecutor had withheld exculpatory evidence from the defense. The Arizona Supreme Court affirmed the new trial order in an unpublished opinion.

Respondent's second trial began in January 1975. During the *voir dire* examination of prospective jurors, the prosecutor made reference to the fact that some of the witnesses whose testimony the jurors would hear had testified in proceedings

---

[1] 546 F. 2d 829 (1977). The order discharging respondent from custody has been stayed pending completion of appellate review.

four years earlier.[2] Defense counsel told the prospective jurors "that there was evidence hidden from [respondent] at the last trial." In his opening statement, he made this point more forcefully:

> "You will hear testimony that notwithstanding the fact that we had a trial in May of 1971 in this matter, that the prosecutor hid those statements and didn't give those to the lawyer for George saying the man was Spanish speaking, didn't give those statements at all, hid them.
>
> "You will hear that that evidence was suppressed and hidden by the prosecutor in that case. You will hear that that evidence was purposely withheld. You will hear that because of the misconduct of the County Attorney at that time and because he withheld evidence, that the Supreme Court of Arizona granted a new trial in this case." App. 180–181, 184.

After opening statements were completed, the prosecutor moved for a mistrial. In colloquy during argument of the motion, the trial judge expressed the opinion that evidence concerning the reasons for the new trial, and specifically the ruling of the Arizona Supreme Court, was irrelevant to the issue of guilt or innocence and therefore inadmissible. Defense counsel asked for an opportunity "to find some law" that would support his belief that the Supreme Court opinion would be admissible.[3] After further argument, the judge stated that

---

[2] The prosecutor's reference was in the context of asking the venire whether they would be able to credit the testimony of a witness if there were inconsistencies between his present testimony and that given in earlier proceedings.

[3] "THE COURT: I cannot conceive how the opinion of the Arizona Supreme Court in this case would be admissible on any basis whatsoever.

"MR. BOLDING: I'll really try to do some additional work, then your Honor, to try to find some law for it. I believe it would be admissible. It's corroborative of the testimony that the jury will hear.

"THE COURT: I'm afraid, and I don't know how we stop it, we're getting to the point where we're trying the County Attorney's office and

he would withhold ruling on the admissibility of the evidence and denied the motion for mistrial. Two witnesses then testified.

The following morning the prosecutor renewed his mistrial motion. Fortified by an evening's research, he argued that there was no theory on which the basis for the new trial ruling could be brought to the attention of the jury, that the prejudice to the jury could not be repaired by any cautionary instructions, and that a mistrial was a "manifest necessity." Defense counsel stated that he still was not prepared with authority supporting his belief that the Supreme Court opinion was admissible.[4] He argued that his comment was invited by the prosecutor's reference to the witnesses' earlier testimony

---

the County Attorney's office, conduct, whatever it was in the last case, and I simply, I am not going to allow it if this trial goes on and I'm very sorely tempted to grant the State's motion at this time.

"MR. BOLDING: Well your Honor, that's—I will be—sorry if that happens and if the Court tells me now that I cannot examine any witness about that Supreme Court decision until I furnish you some law that says yes, that can come in, then I will abide by that decision, your Honor. I will be working on it and I would like to reserve my right to present that to the Court outside the hearing of the jury at another time. I just, I believe that it is, it's credible evidence. It's, thinking, you know, off the top of my head here, it's opinion evidence from experts. It's evidence that I believe is truly corroborative of the evidence that the jury will hear and I would certainly like to reserve my right to present some, if I can find you some written law, which would allow this type of testimony, your Honor, as evidence." App. 209–210.

Later, the trial judge expressed disagreement with defense counsel's argument that evidence of prosecutorial misconduct could be admitted on an impeachment theory: "I don't think you're entitled to prove all this misconduct if such is the case, to impeach every witness, and I think that's what you're saying to me." *Id.,* at 217–218.

[4] "I have not worked on that because I'm not at that stage yet where I think it's necessary to bring that into evidence." *Id.,* at 243. Apparently when counsel made his opening statement, he was not prepared to support the admissibility of the testimony with legal authority.

and that any prejudice could be avoided by curative instructions. During the extended argument, the trial judge expressed his concern about the possibility that an erroneous mistrial ruling would preclude another trial.[5]

Ultimately the trial judge granted the motion, stating that his ruling was based upon defense counsel's remarks in his opening statement concerning the Arizona Supreme Court opinion. The trial judge did not expressly find that there was "manifest necessity" for a mistrial; nor did he expressly state that he had considered alternative solutions and concluded that none would be adequate. The Arizona Supreme Court refused to review the mistrial ruling.[6]

Respondent then filed a petition for writ of habeas corpus in the United States District Court for the District of Arizona, alleging that another trial would violate the Double Jeopardy Clause. After reviewing the transcript of the state proceeding, and hearing the arguments of counsel, the Federal District Judge noted that the Arizona trial judge had not canvassed on the record the possibility of alternatives to a mistrial and expressed the view that before granting a mistrial motion the judge was required "to find that manifest necessity exists for the granting of it."[7] Because the record contained no such finding, and because the federal judge was not prepared to

[5] "[Prosecutor:] The only cure, your Honor, is a mistrial. The State is well aware that if the position I'm taking is wrong, if a mistrial is not proper, that man walks, I know that.

"THE COURT: And I expressed my concern about that, Mr. Butler." *Id.*, at 253.

[6] Respondent filed both a "special action"—a proceeding in the nature of a common-law writ of mandamus or prohibition, see 17A Ariz. Rev. Stat. Ann., Rules of Procedure for Special Actions, Rule 1 (1973)—and a petition for a writ of habeas corpus. Respondent also moved in the trial court to dismiss or quash the information. Petitioner does not raise any question about the adequacy of respondent's exhaustion of available state remedies.

[7] App. 129.

make such a finding himself, he granted the writ.[8]  He agreed with the State, however, that defense counsel's opening statement had been improper.

The Ninth Circuit also characterized the opening statement as improper, but affirmed because, absent a finding of manifest necessity or an explicit consideration of alternatives,[9] the court was unwilling to infer that the jury was prevented from arriving at a fair and impartial verdict.[10]  In a concurring opinion, two judges noted that, while the question of manifest necessity had been argued, most of the argument on the mistrial motion had concerned the question whether the opening statement was improper.  They concluded that, "absent findings that manifest necessity existed, it . . . [was] quite possible that the grant of mistrial was based on the fact that the impropriety of counsel's conduct had been established

---

[8] The District Court indicated that a simple statement by the trial judge to the effect that there was "manifest necessity" for the mistrial would have sufficed to defeat the double jeopardy claim.  *Id.*, at 130–140.

[9] In his opinion for the Court of Appeals, Judge Kilkenny stated:

"In the absence of clear abuse, we are normally inclined to uphold discretionary orders of this nature.  In the usual case, the trial judge has observed the complained-of event, heard counsel, and made specific findings.  Under such circumstances, a mistrial declaration accompanied by a finding that the jury could no longer render an impartial verdict would not be lightly set aside."  546 F. 2d, at 832.

The importance of the absence of express findings or reasons to the decision below seems apparent.  The Arizona trial judge "observed the complained-of event" and patiently "heard counsel."  Had he taken the additional step of making an express finding of "manifest necessity," it appears that Judge Kilkenny would have reviewed the mistrial ruling under a less exacting abuse-of-discretion standard.

[10] In its opinion as originally released, the court stated: "[W]e decline to imply from this impropriety that the jury was completely prevented from arriving at a fair and impartial verdict."  App. 29–30.  The court subsequently amended its opinion to delete the word "completely" from that sentence.  As originally written, the opinion implied that the probability of jury prejudice would not be a sufficient ground for mistrial; only the certainty of prejudice would suffice.

without reaching the question whether there could, nevertheless, be a fair trial." 546 F. 2d, at 833.

We are persuaded that the Court of Appeals applied an inappropriate standard of review to mistrial rulings of this kind, and attached undue significance to the form of the ruling. We therefore reverse.

## II

A State may not put a defendant in jeopardy twice for the same offense. *Benton* v. *Maryland,* 395 U. S. 784. The constitutional protection against double jeopardy unequivocally prohibits a second trial following an acquittal. The public interest in the finality of criminal judgments is so strong that an acquitted defendant may not be retried even though "the acquittal was based upon an egregiously erroneous foundation." See *Fong Foo* v. *United States,* 369 U. S. 141, 143. If the innocence of the accused has been confirmed by a final judgment, the Constitution conclusively presumes that a second trial would be unfair.

Because jeopardy attaches before the judgment becomes final, the constitutional protection also embraces the defendant's "valued right to have his trial completed by a particular tribunal." [11] The reasons why this "valued right" merits constitutional protection are worthy of repetition. Even if the first trial is not completed, a second prosecution may be grossly unfair. It increases the financial and emotional burden

---

[11] This description of the right, which was quoted by Mr. Justice Harlan in his plurality opinion in *United States* v. *Jorn,* 400 U. S. 470, 484, and by the Court in *Illinois* v. *Somerville,* 410 U. S. 458, 466, was formulated by Mr. Justice Black in his opinion for the Court in *Wade* v. *Hunter,* 336 U. S. 684, 689. His complete sentence identifies that right as sometimes subordinate to a larger interest in having the trial end in a just judgment: "What has been said is enough to show that a defendant's valued right to have his trial completed by a particular tribunal must in some instances be subordinated to the public's interest in fair trials designed to end in just judgments." *Ibid.*

on the accused,[12] prolongs the period in which he is stigmatized by an unresolved accusation of wrongdoing,[13] and may even enhance the risk that an innocent defendant may be convicted.[14] The danger of such unfairness to the defendant exists whenever a trial is aborted before it is completed.[15]

---

[12] "Reprosecution after a mistrial has unnecessarily been declared by the trial court obviously subjects the defendant to the same personal strain and insecurity regardless of the motivation underlying the trial judge's action." *United States* v. *Jorn, supra,* at 483.

[13] As Mr. Justice Black stated in *Green* v. *United States,* 355 U. S. 184, 187-188:

"The underlying idea, one that is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, *thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity,* as well as enhancing the possibility that even though innocent he may be found guilty." (Emphasis added.)

[14] In *Carsey* v. *United States,* 129 U. S. App. D. C. 205, 208-209, 392 F. 2d 810, 813-814 (1967), Judge Leventhal described how subtle changes in the State's testimony, initially favorable to the defendant, may occur during the course of successive prosecutions:

"[T]he Government witnesses came to drop from their testimony impressions favorable to defendant. Thus a key prosecution witness, the last person to see appellant and the deceased together, who began by testifying that they had acted that evening like newlyweds on a honeymoon, without an unfriendly word spoken, ended up by saying for the first time in four trials that the words between them had been 'firm,' and possibly harsh and 'cross.'

"We also note that the police officer who readily acquiesced in the two 'hung jury' trials that appellant was 'hysterical,' later withheld that characterization. This shift, though less dramatic, was by no means inconsequential in view of the significance of appellant's condition at the time he made a statement inconsistent with what he later told another officer."

See also n. 13, *supra.*

[15] As the Court stated in *Illinois* v. *Somerville, supra,* at 471:

"The determination by the trial court to abort a criminal proceeding where jeopardy has attached is not one to be lightly undertaken, since the interest of the defendant in having his fate determined by the jury

Consequently, as a general rule, the prosecutor is entitled to one, and only one, opportunity to require an accused to stand trial.

Unlike the situation in which the trial has ended in an acquittal or conviction, retrial is not automatically barred when a criminal proceeding is terminated without finally resolving the merits of the charges against the accused. Because of the variety of circumstances that may make it necessary to discharge a jury before a trial is concluded, and because those circumstances do not invariably create unfairness to the accused, his valued right to have the trial concluded by a particular tribunal is sometimes subordinate to the public interest in affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury.[16] Yet in view of the importance of the right, and the fact that it is frustrated by any mistrial, the prosecutor must shoulder the burden of justifying the mistrial if he is to avoid the double jeopardy bar. His burden is a heavy one. The prosecutor must demonstrate "manifest necessity" for any mistrial declared over the objection of the defendant.

The words "manifest necessity" appropriately characterize the magnitude of the prosecutor's burden.[17] For that reason

first impaneled is itself a weighty one. . . . Nor will the lack of demonstrable additional prejudice preclude the defendant's invocation of the double jeopardy bar in the absence of some important countervailing interest of proper judicial administration."

[16] In his opinion announcing the Court's judgment in *United States* v. *Jorn, supra,* at 479–480, Mr. Justice Harlan explained why a rigid application of the "particular tribunal" principle is unacceptable:

"[A] criminal trial is, even in the best of circumstances, a complicated affair to manage. . . . [It is] readily apparent that a mechanical rule prohibiting retrial whenever circumstances compel the discharge of a jury without the defendant's consent would be too high a price to pay for the added assurance of personal security and freedom from governmental harassment which such a mechanical rule would provide."

[17] Whether the phrase "manifest necessity," "evident necessity," see *Winsor* v. *The Queen,* L. R. 1 Q. B. 289, 305 (1866) (Cockburn, C. J.), or

Mr. Justice Story's classic formulation of the test [18] has been quoted over and over again to provide guidance in the decision of a wide variety of cases.[19] Nevertheless, those words do not describe a standard that can be applied mechanically or without attention to the particular problem confronting the trial judge.[20] Indeed, it is manifest that the key word "necessity" cannot be interpreted literally; instead, contrary to the teaching of Webster, we assume that there are degrees of necessity and we require a "high degree" before concluding that a mistrial is appropriate.[21]

---

"imperious necessity," see *Downum* v. *United States,* 372 U. S. 734, 736, is used, the meaning is apparently the same.

[18] "We think, that in all cases of this nature, the law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes . . . . But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the Judges, under their oaths of office." *United States* v. *Perez,* 9 Wheat. 579, 580.

[19] See, *e. g., Wade* v. *Hunter,* 336 U. S. 684 (court-martial proceeding terminated because of military necessity); *Simmons* v. *United States,* 142 U. S. 148 (possible juror bias); *United States* v. *Perez, supra* (hung jury).

[20] As the Court noted in *Illinois* v. *Somerville,* 410 U. S., at 462, the *Perez* "formulation, consistently adhered to . . . in subsequent decisions, abjures the application of any mechanical formula by which to judge the propriety of declaring a mistrial in the varying and often unique situations arising during the course of a criminal trial."

[21] The English courts have long recognized the truth of this proposition in the "hung jury" context:

"This rule if taken literally seems to command the confinement of the jury till death if they do not agree, and to avoid any such consequence an

The question whether that "high degree" has been reached is answered more easily in some kinds of cases than in other. At one extreme are cases in which a prosecutor requests a mistrial in order to buttress weaknesses in his evidence. Although there was a time when English judges served the Stuart monarchs by exercising a power to discharge a jury whenever it appeared that the Crown's evidence would be insufficient to convict,[22] the prohibition against double jeop-

---

exception was introduced in practice which Blackstone has described by the words 'except in case of evident necessity.'

"But the exception so expressed has given rise to further doubts, because necessity is an equivocal word, meaning either irresistible compulsion or a high degree of need. Those who have been interested in objecting to a discharge of a jury before verdict, have disputed whether the discharge was necessary in the stricter sense of the word. The same dispute about the meaning of the word necessity in the exception to this rule is the source of the main questions raised upon this writ of error, and they are in substance answered when we decide on the meaning of that word in the exception to this rule, and apply that meaning to the facts appearing on this record. We assume it to be clear that the discharge of the jury before verdict may be lawful at some time and under some circumstances. Then with reference to the facts on this record, we hold that the judge at the first trial had by law power to discharge the jury before verdict, when a high degree of need for such discharge was made evident to his mind from the facts which he had ascertained. We cannot define the degree of need without some standard for comparison; we cannot approach nearer to precision than by describing the degree as a high degree such as in the wider sense of the word might be denoted by necessity." *Winsor* v. *The Queen, supra,* at 390, 394.

[22] *E. g., Whitebread,* 7 How. St. Tr. 311 (1679). See also *The Queen* v. *Charlesworth,* 1 B. & S. 460, 500, 121 Eng. Rep. 786, 801 (Q. B. 1861); Friedland, Double Jeopardy 13–14, 21–25 (1969); Sigler, Double Jeopardy 87 (1969); Douglas, An Almanac of Liberty 143 (1954). In reaction, the rule developed in England that the judge should not discharge the jury prior to verdict except in cases of "evident necessity." *Winsor* v. *The Queen, supra,* at 304–305. However, if, for example, the judge discharged the jury because a key witness for the Crown refused to testify, see *The Queen* v. *Charlesworth, supra,* the accused could nevertheless be retried because jeopardy had not attached under the English rule. *Winsor* v.

ardy as it evolved in this country was plainly intended to condemn this "abhorrent" practice.[23]  As this Court noted in *United States* v. *Dinitz,* 424 U. S. 600, 611:

> "The Double Jeopardy Clause does protect a defendant against governmental actions intended to provoke mistrial requests and thereby to subject defendants to the substantial burdens imposed by multiple prosecutions.  It bars retrials where 'bad-faith conduct by judge or prosecutor' . . . threatens the '[h]arassment of an accused by successive prosecutions or declaration of a mistrial so as to afford the prosecution a more favorable opportunity to convict' the defendant."

Thus, the strictest scrutiny is appropriate when the basis for the mistrial is the unavailability of critical prosecution evidence,[24] or when there is reason to believe that the prosecutor is using the superior resources of the State to harass or to achieve a tactical advantage over the accused.[25]

---

*The Queen, supra,* at 390; *The Queen* v. *Charlesworth, supra;* Friedland, *supra,* at 22–23.

[23] "[I]n the reigns of the latter sovereigns of the Stuart family, a different rule prevailed, that a jury in such case might be discharged for the purpose of having better evidence against him at a future day; and this power was exercised for the benefit of the crown only; but it is a doctrine so abhorrent to every principle of safety and security that it ought not to receive the least countenance in the courts of this country.  In the time of James II, and since the Revolution, this doctrine came under examination, and the rule as laid down by my Lord Coke was revived . . . ." *State* v. *Garrigues,* 2 N. C. 188, 189 (1795).

[24] If, for example, a prosecutor proceeds to trial aware that key witnesses are not available to give testimony and a mistrial is later granted for that reason, a second prosecution is barred. *Downum* v. *United States,* 372 U. S. 734.  The prohibition against double jeopardy unquestionably "forbids the prosecutor to use the first proceeding as a trial run of his case."  Note, Twice in Jeopardy, 75 Yale L. J. 262, 287–288 (1965).

[25] As Mr. Justice Douglas noted in *Downum* v. *United States, supra,* at 736:

"Harassment of an accused by successive prosecutions or declaration of

At the other extreme is the mistrial premised upon the trial judge's belief that the jury is unable to reach a verdict, long considered the classic basis for a proper mistrial.[26] The argument that a jury's inability to agree establishes reasonable doubt as to the defendant's guilt, and therefore requires acquittal, has been uniformly rejected in this country. Instead, without exception, the courts have held that the trial judge may discharge a genuinely deadlocked jury and require the defendant to submit to a second trial. This rule accords recognition to society's interest in giving the prosecution one complete opportunity to convict those who have violated its laws.

Moreover, in this situation there are especially compelling reasons for allowing the trial judge to exercise broad discretion in deciding whether or not "manifest necessity" justifies a discharge of the jury. On the one hand, if he discharges the jury when further deliberations may produce a fair verdict, the defendant is deprived of his "valued right to have his trial completed by a particular tribunal." But if he fails to discharge a jury which is unable to reach a verdict after protracted and exhausting deliberations, there exists a significant risk that a verdict may result from pressures inherent in the situation rather than the considered judgment of all the jurors. If retrial of the defendant were barred whenever an appellate

---

a mistrial so as to afford the prosecution a more favorable opportunity to convict are examples when jeopardy attaches."

Yet, as Mr. Justice Douglas further noted, "those extreme cases do not mark the limits of the guarantee." *Ibid.* The "particular tribunal" principle is implicated whenever a mistrial is declared over the defendant's objection and without regard to the presence or absence of governmental overreaching. If the "right to go to a particular tribunal is valued, it is because, independent of the threat of bad-faith conduct by judge or prosecutor, the defendant has a significant interest in the decision whether or not to take the case from the jury." *United States* v. *Jorn,* 400 U. S., at 485. See discussion in Part III, *infra.*

[26] *Downum* v. *United States, supra,* at 735–736.

court views the "necessity" for a mistrial differently from the trial judge, there would be a danger that the latter, cognizant of the serious societal consequences of an erroneous ruling, would employ coercive means to break the apparent deadlock. Such a rule would frustrate the public interest in just judgments.[27] The trial judge's decision to declare a mistrial when he considers the jury deadlocked is therefore accorded great deference by a reviewing court.[28]

We are persuaded that, along the spectrum of trial problems which may warrant a mistrial and which vary in their amenability to appellate scrutiny, the difficulty which led to the mistrial in this case also falls in an area where the trial judge's determination is entitled to special respect.

In this case the trial judge ordered a mistrial because the defendant's lawyer made improper and prejudicial remarks during his opening statement to the jury. Although respond-

---

[27] This public interest in fair judgments is not of recent origin:

"We do take upon ourselves, without the consent of the parties . . . , to discharge the jury when we are satisfied that they have fully considered the case and cannot agree; and I hope no Judge will shrink from taking that course; for, if a jury cannot agree, we ought not to coerce them by personal suffering, nor ought we to expose parties to the danger of a verdict which is not the result of conviction in the minds of the jury, but produced by suffering of mind or body." *The Queen* v. *Charlesworth*, 1 B. & S., at 503–504, 121 Eng. Rep., at 802.

[28] *United States* v. *Perez*, 9 Wheat. 579; *Logan* v. *United States*, 144 U. S. 263; *Moss* v. *Glenn*, 189 U. S. 506; *Keerl* v. *Montana*, 213 U. S. 135; *Dreyer* v. *Illinois*, 187 U. S. 71. It should be noted, however, that the rationale for this deference in the "hung" jury situation is that the trial court is in the best position to assess all the factors which must be considered in making a necessarily discretionary determination whether the jury will be able to reach a just verdict if it continues to deliberate. If the record reveals that the trial judge has failed to exercise the "sound discretion" entrusted to him, the reason for such deference by an appellate court disappears. Thus, if the trial judge acts for reasons completely unrelated to the trial problem which purports to be the basis for the mistrial ruling, close appellate scrutiny is appropriate. Cf. *United States* v. *Gordy*, 526 F. 2d 631 (CA5 1976).

ent insists that evidence of prosecutorial misconduct [29] was admissible as a matter of Arizona law, and therefore that the opening statement was proper, we regard this issue as foreclosed by respondent's failure to proffer any Arizona precedent supportive of his contention [30] and by the state court's interpretation of its own law, buttressed by the consistent opinion of the Federal District Court and the Court of Appeals. Cf. *Bishop* v. *Wood*, 426 U. S. 341, 346–347. We therefore start from the premise that defense counsel's comment was improper and may have affected the impartiality of the jury.

We recognize that the extent of the possible bias cannot be measured, and that the District Court was quite correct in believing that some trial judges might have proceeded with the trial after giving the jury appropriate cautionary instructions. In a strict, literal sense, the mistrial was not "necessary." Nevertheless, the overriding interest in the evenhanded administration of justice requires that we accord the highest degree of respect to the trial judge's evaluation of the likelihood that the impartiality of one or more jurors may have been affected by the improper comment.

---

[29] Of course, we express no opinion regarding whether the failure of the prosecutor to hand over *Brady* (*Brady* v. *Maryland*, 373 U. S. 83) material to the defense at the first trial was deliberate or inadvertent. The decision of the Arizona Supreme Court granting respondent a new trial, in our opinion, does not specifically address the matter. We simply accept for the purpose of analysis respondent's characterization of the failure to disclose the evidence as misconduct.

[30] Respondent relies on *State* v. *Burruell*, 98 Ariz. 37, 401 P. 2d 733 (1965), as the Arizona decision most supportive of admissibility. Tr. of Oral Arg. 30. This case, however, simply stands for the well-accepted proposition that a witness may be impeached with evidence tending to show that he has an interest in giving testimony favorable to the State and against the defendant. It undoubtedly would have been proper for defense counsel to use the statements suppressed at the first trial during the second trial, but there is nothing in *Burruell* which would suggest that the fact of the suppression would have been admissible for any purpose at the second trial.

The consistent course of decision in this Court in cases involving possible juror bias supports this conclusion. *Simmons* v. *United States,* 142 U. S. 148, involved the possibility of bias caused by a newspaper story describing a letter written by defense counsel denying a charge by a third party that one of the jurors was acquainted with the defendant. Without determining the truth or falsity of the charge, and without examining the jurors to ascertain what influence the story had upon them, the trial judge declared a mistrial because he considered it " 'impossible that in the future consideration of this case by the jury there can be that true independence and freedom of action on the part of each juror which is necessary to a fair trial of the accused.' " *Id.,* at 150. This Court affirmed, holding that the judge was justified in concluding that the publication of the letter had made it impossible for the jury "to act with the independence and freedom on the part of each juror requisite to a fair trial of the issue between the parties." *Id.,* at 155.

In *Thompson* v. *United States,* 155 U. S. 271, 279, the Court concluded that a mistrial was required when it was revealed that one of the trial jurors had served on the grand jury that indicted the defendant. Since it is possible that the grand jury had heard no more evidence—and perhaps even less— than was presented at the trial, and since the juror in question may have had no actual bias against the defendant, the record did not demonstrate that the mistrial was strictly "necessary." There can be no doubt, however, about the validity of the conclusion that the possibility of bias justified the mistrial.

An improper opening statement unquestionably tends to frustrate the public interest in having a just judgment reached by an impartial tribunal. Indeed, such statements create a risk, often not present in the individual juror bias situation,[31] that the entire panel may be tainted. The trial judge, of

---

[31] For example, if there is a suggestion of individual juror bias, it may be possible to replace that juror with an alternate.

course, may instruct the jury to disregard the improper comment. In extreme cases, he may discipline counsel, or even remove him from the trial as he did in *United States* v. *Dinitz,* 424 U. S. 600. Those actions, however, will not necessarily remove the risk of bias that may be created by improper argument. Unless unscrupulous defense counsel are to be allowed an unfair advantage, the trial judge must have the power to declare a mistrial in appropriate cases. The interest in orderly, impartial procedure would be impaired if he were deterred from exercising that power by a concern that any time a reviewing court disagreed with his assessment of the trial situation a retrial would automatically be barred. The adoption of a stringent standard of appellate review in this area, therefore, would seriously impede the trial judge in the proper performance of his "duty, in order to protect the integrity of the trial, to take prompt and affirmative action to stop . . . professional misconduct." *Id.,* at 612.[32]

There are compelling institutional considerations militating in favor of appellate deference to the trial judge's evaluation of the significance of possible juror bias.[33] He has seen and

---

[32] In his concurring opinion in *Dinitz,* MR. CHIEF JUSTICE BURGER emphasized the narrow purpose and scope of a legitimate opening statement:

"It is to state what evidence will be presented, to make it easier for the jurors to understand what is to follow, and to relate parts of the evidence and testimony to the whole; it is not an occasion for argument. To make statements which will not or cannot be supported by proof is, if it relates to significant elements of the case, professional misconduct. Moreover, it is fundamentally unfair to an opposing party to allow an attorney, with the standing and prestige inherent in being an officer of the court, to present to the jury statements not susceptible of proof but intended to influence the jury in reaching a verdict." 424 U. S., at 612.

Our identification of this reason for according deference to the trial judge in juror bias cases generally is not intended as a comment upon the conduct of defense counsel in this case.

[33] These considerations must be at least as weighty where a federal court, in considering a state prisoner's collateral challenge to his conviction on

heard the jurors during their *voir dire* examination.   He is the judge most familiar with the evidence and the background of the case on trial.   He has listened to the tone of the argument as it was delivered and has observed the apparent reaction of the jurors.   In short, he is far more "conversant with the factors relevant to the determination" than any reviewing court can possibly be.   See *Wade* v. *Hunter,* 336 U. S. 684, 687.

### III

Our conclusion that a trial judge's decision to declare a mistrial based on his assessment of the prejudicial impact of improper argument is entitled to great deference does not, of course, end the inquiry.   As noted earlier, a constitutionally protected interest is inevitably affected by any mistrial decision.   The trial judge, therefore, "must always temper the decision whether or not to abort the trial by considering the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate." *United States* v. *Jorn,* 400 U. S., at 486 (Harlan, J.).   In order to ensure that this interest is adequately protected, reviewing courts have an obligation to satisfy themselves that, in the words of Mr. Justice Story, the trial judge exercised "sound discretion" in declaring a mistrial.

Thus, if a trial judge acts irrationally or irresponsibly, cf. *United States* v. *Jorn, supra;* see *Illinois* v. *Somerville,* 410 U. S., at 469, his action cannot be condoned.   But our review of this record indicates that this was not such a case.[34]   Defense

the ground that it violated the Double Jeopardy Clause, reviews the determination of a state trial judge as to juror bias.

[34] In this case, defense counsel made brief reference during *voir dire* to the fact that evidence was withheld from the defense at the previous trial.   Later in the *voir dire* the prosecutor expressed his concern to the trial judge that if the jurors were aware of the fact that respondent obtained a new trial because the prosecution failed to produce some evidence, they might be prejudiced against the State.   In response to the

counsel aired improper and highly prejudicial evidence before the jury, the possible impact of which the trial judge was in the best position to assess. The trial judge did not act precipitately in response to the prosecutor's request for a mistrial. On the contrary, evincing a concern for the possible double jeopardy consequences of an erroneous ruling, he gave both defense counsel and the prosecutor full opportunity to explain

---

prosecutor's concern, the trial judge conducted an inquiry into whether the jurors knew the reason for the new trial. The inquiry revealed that the jurors were not then aware of the reason for the new trial. During the opening statements which followed, however, defense counsel did not leave the matter to the jurors' conjecture; instead, he explicitly stated that they would hear testimony showing that the Supreme Court of Arizona granted respondent a new trial because the prosecutor deliberately withheld exculpatory evidence from the defense. Following completion of opening argument, the prosecutor moved for a mistrial.

During argument on the prosecutor's motion, defense counsel insisted that evidence of prosecutorial misconduct in a prior proceeding was admissible for impeachment purposes; although he could offer no authority to support this novel proposition, he indicated to the judge that he would appreciate an opportunity to "find . . . some written law, which would allow this type of testimony . . . as evidence." *Supra*, at 500 n. 3. While the trial judge remarked that he could conceive of no basis for the admission of such evidence and that he was tempted to grant the prosecutor's request immediately because of defense counsel's injection of the prosecutorial misconduct issue into the trial, *supra*, at 499–500, n. 3, he did not act precipitately. Rather, proceeding with caution and giving defense counsel the benefit of the doubt, App. 223, the trial judge reserved ruling on the admissibility question and at first denied the mistrial motion. In avoiding a hasty decision despite his conviction that the evidence was improper, the trial judge was plainly acting out of concern for the double jeopardy interests implicated by an improvident mistrial. *Id.*, at 225, 253.

The following day the prosecutor renewed his motion. The trial judge heard extensive argument from both sides regarding both the propriety of defense counsel's opening statement and the need for a mistrial. Defense counsel contended that any prejudice which might have resulted from the references to prosecutorial misconduct could be cured by cautionary instructions; the prosecutor argued that such an alternative would be inadequate to remove the risk of taint.

their positions on the propriety of a mistrial. We are therefore persuaded by the record that the trial judge acted responsibly and deliberately, and accorded careful consideration to respondent's interest in having the trial concluded in a single proceeding. Since he exercised "sound discretion" in handling the sensitive problem of possible juror bias created by the improper comment of defense counsel, the mistrial order is supported by the "high degree" of necessity which is required in a case of this kind.[35] Neither party has a right to have his case decided by a jury which may be tainted by bias;[36] in these circumstances, "the public's interest in fair trials designed to end in just judgements"[37] must prevail over the defendant's "valued right" to have his trial concluded before the first jury impaneled.

## IV

One final matter requires consideration. The absence of an explicit finding of "manifest necessity" appears to have been determinative for the District Court and may have been so for the Court of Appeals. If those courts regarded that omission as critical,[38] they required too much. Since the record provides

---

[35] Two considerations, while not determinative, add support to this conclusion. First, crowded calendars throughout the Nation impose a constant pressure on our judges to finish the business at hand. Generally, they have an interest in having the trial completed as promptly as possible, an interest which frequently parallels the constitutionally protected interest of the accused in having the trial concluded by a particular tribunal. Second, respondent does not attempt to demonstrate specific prejudice from the mistrial ruling, other than the harm which always accompanies retrial. Cf. *McNeal* v. *Hollowell*, 481 F. 2d 1145, 1147 (CA5 1973).

[36] In *United States* v. *Morris*, 26 F. Cas. 1323 (No. 15,815) (CC Mass. 1851), Mr. Justice Curtis held that even after the jury had been sworn, it was not too late to challenge a juror for bias. He pointed out that neither party "can have a vested right to a corrupt or prejudiced juror, who is not fit to sit in judgment in the case." *Id.*, at 1328.

[37] *Wade* v. *Hunter*, 336 U. S., at 689.

[38] See nn. 7–10 and accompanying text, *supra*.

sufficient justification for the state-court ruling, the failure to explain that ruling more completely does not render it constitutionally defective.

Review of any trial court decision is, of course, facilitated by findings and by an explanation of the reasons supporting the decision. No matter how desirable such procedural assistance may be, it is not constitutionally mandated in a case such as this. Cf. *Cupp* v. *Naughten,* 414 U. S. 141, 146. The basis for the trial judge's mistrial order is adequately disclosed by the record, which includes the extensive argument of counsel prior to the judge's ruling. The state trial judge's mistrial declaration is not subject to collateral attack in a federal court simply because he failed to find "manifest necessity" in those words or to articulate on the record all the factors which informed the deliberate exercise of his discretion.[39]

The judgment of the Court of Appeals is

*Reversed.*

Mr. Justice Blackmun concurs in the result.

Mr. Justice White, dissenting.

I cannot agree with the Court of Appeals that the failure of a state trial judge to express the legal standard under which

---

[39] The Court of Appeals was concerned that the trial judge may have granted the State's mistrial motion because the comments of defense counsel were improper without considering the possible impact of those comments on the impartiality of the jurors. We think this concern was unwarranted. Shortly after defense counsel made his first, brief reference to the withholding of evidence in the earlier trial, the judge indicated his concern regarding the possible "poisoning of the panel." In addition, both sides argued the question of juror bias and offered their views on whether action short of a mistrial would suffice to eliminate the risk of taint. Finally, the trial judge indicated his awareness of the grave consequences of an erroneous mistrial ruling. We are unwilling to assume that a judge, who otherwise acted responsibly and deliberately, simply neglected to consider one of the central issues presented by the mistrial motion and argued by the parties when he made his ruling.

he has declared a mistrial is, in itself and without further examination of the record, sufficient reason to infer constitutional error foreclosing a second trial. The Court's opinion in *Townsend* v. *Sain,* 372 U. S. 293 (1963), is to the contrary. There, in the course of a full scale exposition of the proper approach to be followed by a federal court in determining whether a writ of habeas corpus should be issued on the petition of a state prisoner, the Court addressed the situation where the state trial judge, in making the challenged ruling, did not articulate the constitutional standard under which he acted. The Court concluded that "the coequal responsibilities of state and federal judges in the administration of federal constitutional law are such that we think the district judge may, in the ordinary case in which there has been no articulation, properly assume that the state trier of fact applied correct standards of federal law to the facts, in the absence of evidence . . . that there is reason to suspect that an incorrect standard was in fact applied." *Id.,* at 314–315. A silent record is not a sufficient basis for concluding that the state judge has committed constitutional error; the mere possibility of error is not enough to warrant habeas corpus relief.

The Court of Appeals, as well as the District Court, was therefore in error in granting relief without further examination of the record to determine whether the use of an incorrect legal standard was sufficiently indicated by something beyond mere silence and, if not, whether the declaration of a mistrial, which the Court of Appeals said it was "normally inclined to uphold," at least in the absence of "clear abuse of discretion," was constitutionally vulnerable. I would not, however, undertake an examination of the record here in the first instance. Rather, I would vacate the judgment of the Court of Appeals and direct that court to remand the case to the District Court to make the initial judgment, under the correct legal standard, as to whether the writ should issue.

This disagreement with the Court's disposition leads me to dissent.

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN joins, dissenting.

The Court today holds that another trial of respondent, following a mistrial declared over his vehement objection, is not prohibited by the Double Jeopardy Clause. To reach this result, my Brethren accord a substantial degree of deference to a trial court finding that the Court simply assumes was made but that appears nowhere in the record. Because of the silence of the record on the crucial question whether there was "manifest necessity" for a mistrial, I believe that another trial of respondent would violate his constitutional right not to be twice put in jeopardy for the same offense. I therefore dissent.

My disagreement with the majority is a narrow one. I fully concur in its view that the constitutional protection of the Double Jeopardy Clause "embraces the defendant's 'valued right to have his trial completed by a particular tribunal,'" since a second prosecution inevitably "increases the financial and emotional burden on the accused, prolongs the period in which he is stigmatized by an unresolved accusation of wrongdoing, and may even enhance the risk that an innocent defendant may be convicted." *Ante,* at 503–504 (footnotes omitted). For these reasons, I also agree that, where a mistrial is declared over a defendant's objections, a new trial is permissible only if the termination of the earlier trial was justified by a "manifest necessity" and that the prosecution must shoulder the "heavy" burden of demonstrating such a "high degree" of necessity. *Ante,* at 505–506. Nor do I quarrel with the proposition that reviewing courts must accord substantial deference to a trial judge's determination that the prejudicial impact of an improper opening statement is so

great as to leave no alternative but a mistrial to secure the ends of public justice. *Ante,* at 510, 513–514.[1]

Where I part ways from the Court is in its assumption that an "assessment of the prejudicial impact of improper argument," *ante,* at 514, sufficient to support the need for a mistrial, may be implied from this record. As the courts below found,[2] it is not apparent on the face of the record that termination of the trial was justified by a "manifest necessity" or was the only means by which the "ends of public justice" could be fulfilled, *United States* v. *Perez,* 9 Wheat. 579, 580 (1824).

---

[1] This proposition is essentially unremarkable. It is a truism that findings of fact by the trial court may not be set aside on appeal unless "clearly erroneous," and that on review appropriate deference must be given to the trial court's opportunity to judge the credibility of the witnesses. See, *e. g.,* Fed. Rule Civ. Proc. 52 (a); *Zenith Radio Corp.* v. *Hazeltine Research, Inc.,* 395 U. S. 100, 123 (1969). While the determination that there is no alternative but a mistrial to cure prejudice created by an improper opening statement is in part one of law, in a case of this sort it is based primarily on a factual evaluation of the extent to which the particular jury has been prejudiced.

[2] Contrary to the majority's implication, *ante,* at 502 nn. 8–9, the courts below did not hold that the absence of express findings relating to the necessity for a mistrial was by itself dispositive. Rather, the rulings of the District Court and the Court of Appeals were based on their respective conclusions that on this record it could not independently be determined that "the jury was prevented from arriving at a fair and impartial verdict," and therefore that a finding of manifest necessity was not implicit in this record. 546 F. 2d 832; see App. 128–129 (District Court's view that any prejudice could have been cured by cautionary instruction).

Nor can I agree with the majority that the Court of Appeals applied an inappropriate standard of review. It expressly recognized that "[t]he power to discharge a jury . . . is discretionary with the trial court" and that, "[i]n the absence of clear abuse, we . . . normally . . . uphold discretionary orders of this nature." 546 F. 2d, at 832. But this is so, noted the court, where "[i]n the usual case, the trial judge has observed the complained-of event, heard counsel, and made specific findings. Under such circumstances, a mistrial declaration accompanied by a finding that the jury could no longer render an impartial verdict would not lightly be set aside." *Ibid.*

See also *ante,* at 511. Defense counsel's improper remarks occupied only one page of a lengthy opening statement. Despite the fact that the prosecutor had vigorously interrupted the opening statement at numerous 'points to assert various objections,[3] he made no objection to the remarks that formed the basis for the mistrial. If the argument of defense counsel had had a visibly obvious impact on the jurors when uttered, it is hard to believe that this prosecutor would have waited until after the opening statement was finished and the luncheon recess concluded before making his objection known.

Although from this distance and in the absence of express findings it is impossible to determine the precise extent to which defense counsel's remarks may have prejudiced the jury against the State, the circumstances set forth above suggest that any such prejudice may have been minimal and subject to cure through less drastic alternatives.[4] For example, the jury could have been instructed to disregard any mention of prior legal rulings as irrelevant to the issues at hand, and to consider as evidence only the testimony and exhibits admitted through witnesses on the stand.[5] Were there doubt

---

[3] See App. 173, 176, 178, 182, 183.

[4] As is recognized by the majority in its search for an implied finding that the prejudice was sufficient to warrant a mistrial, mere error by either the prosecutor or the defense is insufficient by itself to provide the "high degree" of necessity, *ante,* at 506, required to permit a retrial following the grant of a mistrial over the defendant's objections. See *United States* v. *Dinitz,* 424 U. S. 600, 608 (1976), quoting *United States* v. *Jorn,* 400 U. S. 470, 484 (1971) (plurality opinion of Harlan, J.).

[5] I do not mean to suggest that curative instructions are always or even generally sufficient to cure prejudice resulting from evidentiary errors, see *Bruton* v. *United States,* 391 U. S. 123, 129 (1968), quoting *Krulewitch* v. *United States,* 336 U. S. 440, 453 (1949) (Jackson, J., concurring), particularly where the error is one by the prosecutor and must be shown to have been harmless beyond any reasonable doubt in order for the conviction to be sustained, see *Chapman* v. *California,* 386 U. S. 18, 21–24 (1967). However, it must be recognized that the cases are legion in which convictions have been upheld despite the jury's exposure to improper material

whether such instructions alone would suffice to cure the taint, the jury could have been questioned about the extent of any prejudice. Given the anticipated length of the trial (almost two weeks),[6] it is not unlikely that, had the jury been appropriately instructed when the court first found defense counsel to have erred in his opening statement, any prejudice would have dissipated before deliberations were to begin. For these reasons, it is impossible to conclude that a finding of necessity was implicit in the mere grant of the mistrial.[7]

---

relating to the defendant's past conduct, often because curative instructions have been found sufficient to dispel any prejudice. See, e. g., *United States* v. *Bloom,* 538 F. 2d 704, 710 (CA5 1976); *id.,* at 711 (Tuttle, J., concurring); *United States* v. *Plante,* 472 F. 2d 829, 831–832 (CA1), cert. denied, 411 U. S. 950 (1973); *United States* v. *Roland,* 449 F. 2d 1281 (CA5 1971); *Driver* v. *United States,* 441 F. 2d 276 (CA5 1971); *Beasley* v. *United States,* 94 U. S. App. D. C. 406, 218 F. 2d 366 (1954), cert. denied, 349 U. S. 907 (1955). See also *United States* v. *Hoffman,* 415 F. 2d 14, 21 (CA7), cert. denied, 396 U. S. 958 (1969) (prosecutor's closing argument referring to accused as "liar, crook, and wheeler and dealer" was improper but harmless error). If instructions may be found to have cured prosecutorial error relating to the defendant's past misconduct beyond a reasonable doubt, they ought surely to be considered in deciding whether to subject a defendant to a second trial because of defense error in referring to past misconduct by the prosecution.

[6] See Tr. of *Voir Dire* by Defendant's Counsel 22.

[7] In this respect, the instant case differs markedly from the situation in *Thompson* v. *United States,* 155 U. S. 271 (1894), discussed *ante,* at 512. There, upon discovery that one of the petit jurors had served on the grand jury indicting the defendant, the trial court immediately announced that, "[if it] is insisted on by the gentlemen, there is no way left but for the court to discharge the jury on that ground . . . ." Record in No. 637, O. T. 1893, p. 20. Defense counsel objected to the juror's participation, but also objected to a discharge of the jury, arguing that he was entitled to an acquittal once having been placed in jeopardy. The trial court was of the view, clearly correct, that had the juror remained on the panel despite counsel's objection any conviction would have been reversed. *Id.,* at 21–22. That being the case, the trial court held that the jury could be discharged and a new jury impaneled without violating the Double Jeopardy Clause. This Court affirmed.

As the majority concedes, *ante,* at 501, there was no express determination or evaluation by the trial court of the degree of prejudice caused by the improper remarks; nor was there any exploration of possible alternatives to the drastic solution of declaring a mistrial; nor, indeed, any express indication on the face of the record that the trial court was aware of the dictates of the *Perez* doctrine. Over the two days during which the mistrial motion was argued, the entire thrust of the trial court's questions and comments was to determine whether there was any legal basis for admitting into evidence the Arizona Supreme Court's ruling that the prosecution in an earlier trial had suppressed evidence exculpatory of respondent, to which ruling defense counsel had adverted in opening statement.[8] The tenor of the court's remarks throughout—including its statement in declaring the mistrial[9]—suggests that the only question considered was that of admissibility.[10]

---

[8] Thus, while the trial court repeatedly challenged defense counsel on his theories for admissibility of the Arizona Supreme Court's ruling, see App. 204, 205, 209, 211, 217, 248, not once did the court refer to "manifest necessity"; question defense counsel as to the nature of any curative instructions that might be propounded; or otherwise indicate a consciousness that mere error on either side is insufficient to warrant the grant of a mistrial over defense objections, see n. 4, *supra.*

[9] "Based upon defense counsel's remarks in his opening statement concerning the Arizona Supreme Court opinion and its effect for the reasons for the new trial, the motion for mistrial will be granted." App. 271–272. As was noted in the Court of Appeals, the circumstances of the argument on the mistrial motion and the ruling itself make it "quite possible that the grant of mistrial was based on the fact that the impropriety of counsel's conduct had been established without reaching the question whether there could, nevertheless, be a fair trial." 546 F. 2d, at 833 (Merrill, J., concurring).

[10] The majority relies on three aspects of the record to support its conclusion that the trial court did make an evaluation of the prejudicial impact of counsel's remarks and of the need for a mistrial to correct the error. *Ante,* at 514–515, n. 34, 517 n. 39. The first is that the trial court was aware of the double jeopardy consequences of an improvidently granted mistrial, namely, that the defendant may not be tried again. While this

There is no doubt that the trial court's exploration of the evidentiary question was conscientious and deliberate. The majority infers from this care that the trial court must have been aware of the correct legal standard governing the permissibility of retrials following mistrials, and must impliedly, though not expressly, have made the requisite findings of necessity. The deliberation with which the trial court dealt with the evidentiary issue, however, only highlights its failure to address what I believe must be the key inquiry: whether a mistrial, and its abrogation of a defendant's constitutionally protected interest in completing his trial before a particular tribunal, *United States* v. *Jorn,* 400 U. S. 470, 486 (1971) (plurality opinion of Harlan, J.); *Wade* v. *Hunter,* 336 U. S. 684, 689 (1949), is the only way to secure the public interest in a just disposition of the charges.

I do not propose that the Constitution invariably requires a trial judge to make findings of necessity on the record to justify the declaration of a mistrial over a defendant's objec-

---

is true, none of the comments by the court suggests a concern with the propriety of anything other than its ruling on the evidentiary question. See App. 225, 253. Second, the majority points to the fact that counsel each argued whether the prejudice could be cured by means other than a mistrial. But such argument occupied only a minuscule portion of each side's discussion and elicited no comment or response from the court.

Finally, the Court notes that at the *voir dire* of the jury, the trial court expressed concern about "poisoning of the panel" and that to allay this concern, the jury was questioned as to its knowledge of the reasons for a new trial. The transcript of the *voir dire,* however, suggests that this questioning had two purposes: to determine whether any jurors knew why there was a second trial, and to determine whether such knowledge would prejudice them in their deliberations. Tr. of *Voir Dire, supra,* at 35. Since no jurors knew of the reason for the new trial, no inquiry was made as to prejudice—recognized at this time by the court and by counsel as a separate issue. None of these portions of the record establishes that the trial court at any time made a determination that the prejudice from counsel's opening statement could not be cured by an instruction, or that the court had any basis, such as through a *voir dire,* on which to make such a determination.

tions. For example, where the nature of the error is one that "would make reversal [of any conviction] on appeal a certainty," *Illinois* v. *Somerville,* 410 U. S. 458, 464 (1973), the appropriate finding may be implied from the declaration of a mistrial.[11] What the "manifest necessity" doctrine does require, in my view, is that the record make clear either that there were no meaningful and practical alternatives to a mistrial, or that the trial court scrupulously considered available alternatives and found all wanting but a termination of the proceedings. See *United States* v. *Jorn, supra,* at 485; *Illinois* v. *Somerville, supra,* at 478–479 (MARSHALL, J., dissenting). The record here, as demonstrated above, does neither.

Where the need for a mistrial is not "plain and obvious," *United States* v. *Perez,* 9 Wheat., at 580, the importance of an affirmative indication that the trial court made the relevant findings is apparent. In the chaos of conducting a trial, with the welter of administrative as well as legal concerns that must occupy the mind of the trial judge, it is all too easy to overlook a legal rule or relevant factor in rendering decision. A requirement of some statement on the record addressed to the need for a mistrial would ensure that appropriate consideration is given to the efficacy of other alternatives and that mistrial decisions are not based upon improper, or only partly adequate, criteria. Of particular relevance here, moreover, it would facilitate proper appellate and habeas review, avoiding the need to speculate on the basis for the decision to terminate the trial.[12] These considerations have special force when a

---

[11] See, *e. g., Thompson* v. *United States,* discussed *ante,* at 512, and in n. 7, *supra.* Although not every error that would require reversal upon conviction necessitates a mistrial, frequently the "high degree of necessity" required by the *Perez* doctrine is present, and may be implied from the record if not expressed thereon, when an error of such magnitude prompts a mistrial. See *Illinois* v. *Somerville,* 410 U. S. 458, 477–483 (1973) (MARSHALL, J., dissenting).

[12] Moreover, given the wide variety of situations in which it may be appropriate to grant a mistrial, and the difficulty in setting forth a single

mistrial is sought on the ground of jury bias resulting from trial counsel's error. The trial court is uniquely situated to evaluate the seriousness of any such prejudice, see *ante*, at 513–514, and its failure contemporaneously to do so may preclude meaningful subsequent determination of whether the mistrial was properly granted over the defendant's objection. Thus, where the necessity for a mistrial is not manifest on the face of the record, I would hold that the record must clearly indicate that the trial court made a considered choice among the available alternatives.[13]

Had the court here explored alternatives on the record, or made a finding of substantial and incurable prejudice or other "manifest necessity," this would be a different case and one in which I would agree with both the majority's reasoning and its result.[14] On this ambiguous record, however, the

---

standard that can provide meaningful guidance on each occasion, a statement of reasons by the trial court would contribute to the development of a body of rules, precedents, and principles that might be useful in providing guidance to other courts. Cf. *United States ex rel. Johnson* v. *Chairman of N. Y. State Bd. of Parole*, 500 F. 2d 925, 928–934 (CA2), vacated as moot, 419 U. S. 1015 (1974).

[13] Given the importance of respondent's constitutionally protected interest in avoiding unnecessary second trials, *United States* v. *Jorn*, 400 U. S., at 486, it might even be argued that a statement of reasons explicitly relating to the need for a mistrial is always required. I do not go this far here, but only observe that we have held in numerous contexts that governmental decisionmakers must state their reasons for decision, particularly where the decision is adverse to the constitutionally or statutorily protected interests of an individual. See, *e. g., Morrissey* v. *Brewer*, 408 U. S. 471, 489 (1972); *Goldberg* v. *Kelly*, 397 U. S. 254, 271 (1970).

[14] In *Simmons* v. *United States*, 142 U. S. 148 (1891), discussed *ante*, at 512, the trial court had explained at length the reasons for its conclusion that there was a "manifest necessity" for the mistrial. 142 U. S., at 149–150. Indeed, even in *Thompson* v. *United States*, discussed *ante*, at 512, and in n. 7, *supra*, the trial court's finding that there was "no [other] way" to respond to the grand juror's presence on the petit jury sufficiently indicated on the record an exercise of discretion informed by the "manifest necessity" standard.

absence of any such finding—and indeed of any express indication that the trial court applied the manifest-necessity doctrine—leaves open the substantial possibility that there was in fact no need to terminate the proceedings. While the Court states that a "high degree" of necessity is required before a mistrial may properly be granted, its reading of the record here is inconsistent with this principle.

I would therefore affirm the judgment of the Court of Appeals.