# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### April 25, 2006 Session

## STATE OF TENNESSEE v. CAROLETTE STEPHENS

**Appeal from the Criminal Court for Knox County**
**No. 75690    Mary Beth Leibowitz, Judge**

---

**No. E2005-01925-CCA-R9-CD - Filed October 13, 2006**

---

The appellant, Carolette Stephens, was indicted on one count of second degree murder. During the jury trial in May of 2005, the trial court <u>sua</u> <u>sponte</u> declared a mistrial over objection of both the State and the appellant. The case was immediately rescheduled for trial. The appellant sought a dismissal of the indictment, arguing that the retrial placed the appellant in double jeopardy. The trial court denied the motion to dismiss the indictment, but permitted the appellant to seek an interlocutory appeal. This Court granted the interlocutory appeal. On appeal, the appellant presents the following issues: (1) whether the State provoked the trial court into granting a mistrial by eliciting testimony regarding an unconstitutional search warrant that had been suppressed by the trial court; (2) whether the trial court erred in granting a mistrial based on manifest necessity; and (3) whether the appellant's rights to protection against double jeopardy will be violated by a retrial for second degree murder. Because the trial court improperly declared a mistrial without a manifest necessity for doing so, the double jeopardy provisions of the federal and state constitutions prohibit a retrial of the appellant on the charge that is the subject of this appeal. The judgment of the trial court denying the appellant's motion to dismiss is therefore reversed and the indictment dismissed.

**Tenn. R. App. P. 3; Judgment of the Circuit Court is Reversed and Dismissed**

JERRY L. SMITH, J., delivered the opinion of the court, in which THOMAS T. WOODALL, J. joined and JAMES CURWOOD WITT. JR., J., filed a separate concurring opinion.

Robert L. Jolley, Jr., Knoxville, Tennessee, for the appellant, Carolette Stephens.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Kevin Allen, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

## Factual Background

In October of 2002, the appellant was indicted by a Knox County Grand Jury with one count of second degree murder. Subsequently, the appellant filed a motion to suppress all items seized as a result of a search warrant issued for the appellant's apartment. The trial court granted the motion to suppress, "excluding from evidence in this case all items found inside the defendant's residence and seized during the search conducted by police pursuant to the warrant issued on July 12, 2002."

The trial of the matter began on May 2, 2005. At trial, Larry Boling, a security officer for Fort Sanders Medical Center in downtown Knoxville, testified that at approximately 4:00 p.m. on July 12, 2002, he noticed a disturbance at the ambulance doors. Mr. Boling witnessed a man being brought in from outside. The man was slumped over in a wheelchair and was being assisted by a nurse and the unidentified driver of a vehicle parked outside. The driver of the vehicle was later identified as the appellant. Mr. Boling assisted in getting the patient to the treatment area, then returned to the lobby to get more information from the driver of the vehicle. Upon his return, Mr. Boling discovered that the driver and the vehicle were gone. Mr. Boling contacted the security dispatcher to secure the videotape of the closed circuit television in the emergency drop-off area. The police reviewed the videotape upon their arrival.

Dr. Michael Deboer was one of the physician's on duty in the emergency room at Fort Sanders Medical Center on July 12, 2002. Dr. Deboer treated the victim, Orlando Durray Bennett, who was pronounced dead after unsuccessful attempts at resuscitation.

Freda Vinson, the victim's aunt, testified that the appellant and the victim were dating at the time of the victim's death. Ms. Vinson stated that there were problems in the relationship that surfaced after the appellant accused the victim of cheating on her with another woman. The appellant told Ms. Vinson during a telephone conversation that she was going to kill the victim.

Broderick Rogers was a friend of both the appellant and the victim. Mr. Rogers testified that on July 12, 2002, he was in the Lonsdale Homes area of Knoxville on Texas Avenue, where the appellant lived. Mr. Rogers walked by the appellant's apartment and noticed someone's foot hanging out the door. Mr. Rogers ran to the door to see what was going on. When Mr. Rogers opened the door, the victim fell onto him. Mr. Rogers stated that the victim had several holes in his shirt and that his chest area was bloody.

Mr. Rogers saw the appellant inside the apartment, kneeling in the floor, cleaning up blood. The appellant did not explain what had happened inside the apartment. Mr. Rogers helped carry the victim to a car so that he could be taken to the hospital. Mr. Rogers testified that he did not see anyone else inside the apartment.

Qwandell Vinson, the victim's cousin, testified that he received a telephone call from the appellant on July 12, 2002. According to Mr. Vinson, the appellant asked him to "come get" the victim "before [she] kill[ed] him." Mr. Vinson told the appellant not to do anything. During the conversation, Mr. Vinson could hear the victim in the background asking Mr. Vinson to come get him. When Mr. Vinson arrived at the apartment, it was surrounded by police cars.

Larry Vineyard, a former investigator for the Knoxville Police Department, testified that he was assigned to investigate the murder of the victim. Investigator Vineyard went to the emergency room after being advised that the victim was transported to the hospital by an unidentified female driver. After reviewing the security camera tape and being advised that the victim had died, Investigator Vineyard went to the apartment on Texas Avenue where the victim had been living with the appellant. When Investigator Vineyard arrived on the scene, he was informed by another officer that there was what appeared to be blood on the front porch. Upon further inspection, Investigator Vineyard also discovered what appeared to be blood on the back porch. During Investigator Vineyard's testimony, the following exchange occurred:

> COUNSEL FOR THE STATE: Okay. When you arrived there - - was [sic] there other personnel besides Investigator Bell there?
>
> INVESTIGATOR VINEYARD: There was a police officer. I don't remember what his name was. But there was [sic] civilians standing around the location because the police were there.
>
> COUNSEL FOR THE STATE: How many people?
>
> INVESTIGATOR VINEYARD: Oh, there was [sic] probably ten or fifteen people probably standing in the general area of the front of the apartment complex.
>
> COUNSEL FOR THE STATE: Okay. Had the crime scene been secured or unsecured?
>
> INVESTIGATOR VINEYARD: It was secured. The area in front of the apartment had been secured and the back of that apartment.
>
> COUNSEL FOR THE STATE: Okay. And what did you find? Did you notice anything unusual? You said there was blood on the front porch. Did you notice anything usual [sic] about the front porch?
>
> INVESTIGATOR VINEYARD: Uh, nothing unusual that I - - that I can think of.
>
> COUNSEL FOR THE STATE: What did you and Investigator Jones do next?

> INVESTIGATOR VINEYARD: We, uh, checked the area. We, uh, went - - had - - it was a situation where we asked for a search warrant to possibly go inside the location.

At that point, counsel for the appellant asked to approach the bench and, outside the hearing of the jury, objected to Investigator Vineyard's mention of the suppressed search warrant, but specifically stated that he did not want a mistrial. The trial court excused the jury for a jury-out hearing on the matter. During the hearing, the appellant moved for a dismissal of the indictment because "jeopardy has attached" and the discussion of the search warrant was ruled "totally inadmissible in these proceedings." Counsel for the appellant sought a "flat out dismissal" rather than a mistrial.

Counsel for the State asked the trial court to give a curative instruction, arguing that it was an:

> [H]onest mistake. It was an open-ended question by me in reference. And of course, you Honor, and everybody in this courtroom knows I was going to the dumpster. That's where I wanted to get. And he leaped over the dumpster and went to the - - and what he said Judge, as that - - that he asked for a search warrant for the possibility of getting in the house. There's no prejudice. The only prejudice that could be had from that statement is this jury might think now that I found nothing in the house. That a search warrant was executed and nothing was found so  - - which cuts against me, not for me.

After hearing the arguments of counsel, the trial court determined the following:

> In this case what's been said is, "We applied for a search warrant." Now, at this point I have no way of telling the jury, "Well, now you want to disregard everything that you might think about a search warrant." Obviously, that leads the jury to believe that something happened in that house or that there was something that didn't come out or that nothing was found, i.e., that somebody hid it, as [counsel for the appellant] suggests.
>
> [I] don't want to grant a dismissal in this case. I don't want to grant a judgment of acquittal. I don't think either is the appropriate remedy. I think that the remedy is a mistrial. But I will say that one of the reasons why I think this is a difficult situation is that this is not a strong State's case at this point.
>
> I've heard no more, but as I understand the proof, this - - the case with regard to second degree murder is weak. I don't know what would happen if we kept on going and we got a [m]otion for judgment of acquittal. But I don't think we can even get there.
>
> [I] don't want the jury to sit around. And they'll do it too. They'll speculate about what that meant about that search. They're probably already doing that. So I'm

-4-

going to grant a motion for mistrial, and I'm going to let you all argue at the Court of Criminal Appeals what that means to the future of this case.

A mistrial [sua] sponte is what I'm granting. [I]t's not a motion. I'm granting a mistrial.

The trial court further clarified its findings as follows:

The comment about the search warrant will - - will - - I can't even think of a way to unring that bell with the jury, to explain to the jury to disregard the concept of a search warrant, whether or not there was a search or not to speculate about a search warrant in such a way that would not be prejudicial to [the appellant].

I think, therefore, that creates a manifest necessity [to] declare a mistrial.

Subsequently, the appellant filed a motion to dismiss the indictment and prevent retrial based on double jeopardy. On July 15, 2005, the trial court held a hearing on the motion to dismiss. The trial court ultimately denied the motion to dismiss, and entered an order granting the appellant's motion to seek an interlocutory appeal. This Court granted the application for interlocutory appeal on September 16, 2005. On appeal, the appellant argues that the State provoked the trial court to grant a mistrial by eliciting improper testimony from a witness, that the trial court improperly granted a mistrial, and that a retrial of the appellant is barred by double jeopardy.

<u>Analysis</u>

On appeal, the appellant argues that the trial court erred in denying her motion to dismiss the indictment based on double jeopardy. Specifically, the appellant argues that the State provoked the trial court to grant a mistrial <u>sua</u> <u>sponte</u> after eliciting improper testimony about a suppressed search warrant from a State witness and that retrial of the appellant on the charge of second degree murder is barred by double jeopardy. In other words, the appellant argues that the State provoked the trial court to grant a mistrial. The State contends that the trial court properly ruled that there was a manifest necessity for a mistrial.

The double jeopardy clause of the Fifth Amendment to the United States Constitution provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb . . . ." Article 1, section 10 of the Tennessee Constitution contains a similar provision. As our supreme court has noted many times, the three fundamental principles underlying double jeopardy provide protections against: (1) a second prosecution after an acquittal; (2) a second prosecution after conviction; and (3) multiple punishments for the same offense. <u>State v. Denton</u>, 938 S.W.2d 373, 378 (Tenn. 1996); <u>see</u> <u>also</u> <u>North Carolina v. Pearce</u>, 395 U.S. 711 (1969), <u>overruled</u> <u>in</u> <u>part</u> <u>by</u> <u>Alabama v. Smith</u>, 490 U.S. 794 (1989).

Where the trial is terminated over the objection of the defendant, as is the case herein, the test for lifting the double jeopardy bar to a second trial is the "manifest necessity" standard first enunciated by Justice Story's opinion for the Court in United States v. Perez, 22 U.S. 579 (1824), and adopted in Tennessee in Mahala v. State, 18 Tenn. 532, 536 (1837). Although Perez dealt with the most common form of "manifest necessity," the declaration of a mistrial following a jury's inability to reach a verdict, the principle stated therein applies generally.

> [T]he law has invested Courts of justice with the authority to discharge a jury from giving any verdict, whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for the act, or the ends of public justice would otherwise be defeated. They are to exercise a sound discretion on the subject; and it is impossible to define all the circumstances, which would render it proper to interfere. To be sure, the power ought to be used with the greater caution, under urgent circumstances, and for very plain and obvious causes; and, in capital cases especially, Courts should be extremely careful how they interfere with any of the chances of life, in favor of the prisoner. But, after all, they have the right to order the discharge; and the security which the public have for the faithful, sound, and conscientious exercise of this discretion, rests, in this, as in other cases, upon the responsibility of the Judges, under their oaths of office.

Perez, 22 U.S. at 580. The doctrine of "manifest necessity" safeguards the accused's right to have his trial completed by a particular tribunal, while at the same time preserving "the public's interest in fair trials designed to end in just judgments." Wade v. Hunter, 336 U.S. 684, 689 (1949); Arizona v. Washington, 434 U.S. 497, 505 (1978); Etter v. State, 205 S.W.2d 1, 3 (1947).

The purpose of a mistrial is to correct the damage done to the judicial process when some event has occurred which would preclude an impartial verdict. See Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). The decision whether to grant a mistrial is within the trial court's discretion and will not be disturbed absent an abuse of that discretion. State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991). For this reason, an appellate court's review should provide considerable deference to the trial court's ruling in determining whether an occurrence or event at trial has so prejudiced the defendant or the State as to preclude a fair and impartial verdict. State v. Williams, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). However, as noted, if the trial court does grant a mistrial over the objection of the defendant without a "manifest necessity" for doing so, double jeopardy concerns will prohibit a retrial of the defendant.

In determining whether there is a "manifest necessity" for a mistrial, "'no abstract formula should be mechanically applied and all circumstances should be taken into account.'" State v. Mounce, 859 S.W.2d 319, 322 (Tenn. 1993) (citation omitted). Only when there is "no feasible alternative to halting the proceedings" can a manifest necessity be shown. State v. Knight, 616 S.W.2d 593, 596 (Tenn. 1981).

Again, the issue of whether a retrial shall be allowed must be decided on the circumstances of each case and is within the discretion of the trial judge. The trial judge must weigh the rights of the public to a fair and complete adjudication against the constitutional right of the accused not to be harassed, oppressed by successive trials, or otherwise denied the protection of his constitutional rights. The exercise of this discretion by the trial judge is reviewed by resolving any doubts in favor of the liberty of the citizen. State v. Eva Jean Brown, No. 1167, 1988 WL 136600 (Tenn. Crim. App., at Knoxville, Dec. 20, 1988), perm. app. denied (Tenn. 1989). Further, the prosecution must demonstrate the manifest necessity for and lack of feasible alternatives to the mistrial, even though it was granted sua sponte, if the defendant is to be again tried. Id.

In the case herein, the trial court declared a mistrial sua sponte after Investigator Vineyard interjected improper testimony about the suppressed search warrant. Although Tennessee courts do not apply any exacting standard for determining when a mistrial is necessary after a witness has injected improper testimony, this Court has considered: (1) whether the improper testimony resulted from questioning by the State, rather than having been a gratuitous declaration; (2) the relative strength or weakness of the State's proof; and (3) whether the trial court promptly gave a curative instruction.[1] See State v. Demetrius Holmes, No. E2000-02263-CCA-R3-CD, 2001 WL 1538517, at *1-4 (Tenn. Crim. App., at Knoxville, Nov. 30, 2001); State v. William Dotson, No. 03C01-9803-CC-00105, 1999 WL 357327, at *4 (Tenn. Crim. App., at Knoxville, June 4, 1999). This analytical framework is helpful in the case at bar.

Looking to the above non-exclusive factors and applying them to the case herein, we initially note that there is nothing in the record that indicates that the prosecutor intentionally elicited Investigator Vineyard's statement that the police sought a search warrant for the appellant's apartment. In fact, it appears from the record that the prosecutor did not expect Investigator Vineyard to refer to the search warrant. Indeed, the prosecutor merely asked Investigator Vineyard the next step in his investigation, making no hints whatsoever at the search warrant or the fruits of the search. Moreover, the statement made by Investigator Vineyard was an isolated mention of the search warrant and was immediately halted.

Second, we disagree with the trial court's comments as to the weakness of the State's case at the point the trial was stopped. To the contrary, we determine that the evidence presented up to the point of the mistrial of the appellant's guilt was more than adequate to withstand a motion for judgment of acquittal. According to the victim's aunt, the victim and the appellant were having problems in their personal relationship. Ms. Vinson testified that the appellant told her she was going to kill the victim. Broderick Rogers found the victim at the appellant's apartment he saw a foot hanging out of the door. When Mr. Rogers opened the door, the victim fell out onto Mr. Rogers. At the time, the victim had several holes in his shirt, and his chest area was bloody. Mr.

---

[1]These factors are non-exclusive and may not be pertinent in every case. William Dotson, 1999 WL 357327, at *4; see State v. Mounce, 859 S.W.2d 319, 322 (Tenn. 1993) (holding that determination of propriety of mistrial is not subject to mechanistic determination and should be made on the facts of each individual case).

Rogers saw the appellant in the apartment cleaning up blood. The appellant said nothing to Mr. Rogers. Mr. Rogers helped to place the victim in a car. At some point on the day of the incident, Qwandell Vinson testified that he received a telephone call from the appellant during which the appellant stated that she was going to kill the victim. When Mr. Vinson arrived at the appellant's apartment, it was surrounded by police cars. The appellant was seen and identified as the driver of the vehicle who brought the victim to the hospital and immediately left the scene. While the soundness of the State's case rested on the credibility of the State's witnesses, there was ample evidence presented at the point to of the mistrial to sustain a conviction. Moreover, the trial court declared a mistrial prior to the conclusion of the State's proof. Lastly, the trial court chose not to give a curative instruction, instead determining that a manifest necessity existed for a mistrial because a curative instruction could not be crafted that would provide the necessary relief to the appellant.

Looking at the factors as applicable to this case, we conclude that the trial court erroneously determined that manifest necessity required a mistrial. The opportunity for an impartial verdict was not lost when the investigator made an isolated reference to the suppressed search warrant. See Williams, 929 S.W.2d at 388. The prosecutor did not intentionally elicit the improper testimony and the trial court could have quickly issued a curative instruction to the jury to disregard mention of the search warrant. Further, the investigator did not speak of the fruits of the search, but rather that he "asked" for a search warrant for the appellant's residence. As the assistant district attorney noted at trial with no mention of any evidence that the referenced warrant revealed, in our opinion, it is likely the jury would have concluded that no evidence was found. Moreover, the appellant explicitly opposed the grant of a mistrial. In light of these circumstances, it would violate the federal and state constitutional provisions prohibiting double jeopardy for the appellant to be tried again. Accordingly, we reverse the judgment of the trial court and dismiss the indictment.

<u>Conclusion</u>

For the foregoing reasons, the trial court's judgment denying the motion to dismiss on double jeopardy grounds is reversed and the indictment for second degree murder is dismissed.

_____
JERRY L. SMITH, JUDGE