# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00021-CR

## Ex parte Bryan Alexander Nichols

### FROM THE COUNTY COURT AT LAW NO. 4 OF TRAVIS COUNTY
### NO. 718957, HONORABLE MIKE DENTON, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A mistrial was declared on the State's motion after jeopardy attached at Bryan Alexander Nichols's trial for assaulting his former wife. Nichols subsequently applied for a writ of habeas corpus urging that further prosecution of this case would constitute double jeopardy. *See* U.S. Const. amend. V; Tex. Const. art. I, § 14.[1] The writ issued, the trial court denied relief, and Nichols appealed to this Court.

As a general rule, double jeopardy bars a retrial if, after being impaneled and sworn, a trial jury is discharged without reaching a verdict. *Ex parte Fierro*, 79 S.W.3d 54, 56 (Tex. Crim. App. 2002). Double jeopardy does not apply, however, if the mistrial was granted on the defendant's motion or with his consent or if the mistrial was required by manifest necessity. *Id.* Both exceptions

---

[1] Although Nichols cites both the federal and state constitutions, he does not contend that the Texas Constitution's double jeopardy clause confers any greater protection than does the Fifth Amendment.

are at issue in this case. We conclude that Nichols consented to the mistrial and that manifest necessity was present. Accordingly, we affirm the trial court's order.

### Background

Bryan and Theresa Nichols were divorced in January 2005 after several years of marriage.[2] In December 2005, Bryan was living in Austin with their three youngest children and Theresa was living in Houston with the oldest child, E.N.

Theresa Nichols testified that on the evening of December 13, 2005, she and E.N. drove to Austin, where she was to begin a new job and where she hoped to "work our family back together." They arrived at Bryan's residence at 12:30 a.m. on December 14. Theresa put E.N. to bed on the couch in the living room, then she went to Bryan's room and got into bed with him. Theresa testified that Bryan was angry with her because he had expected her to arrive earlier. They began to argue, and Theresa told Bryan that she was going to go sleep on the couch with E.N. When she started to get out of bed, Bryan "grabbed me and yanked me back down." Bryan then "hit me with an open hand." Theresa testified that Bryan "pushed me down on the bed sideways and told me that since this was going to be the last time he ever got to see me, he was going to make it a good one." Bryan ripped Theresa's clothing and pushed her against the wall. E.N. came into the room, and Bryan ordered her to leave or "she would be next." Theresa said that she managed to get out of bed and was trying to get dressed when Bryan kicked her, knocked her to the floor, and began to choke her.

---

[2] When necessary for clarity, we will use Bryan and Theresa Nichols's first names. All references to "Nichols" in this opinion are to Bryan Nichols.

2

Theresa testified that she made her way to the living room. Bryan seized her purse and took her car keys and cell phone. He then went outside, saying he was going to call the police. Theresa closed the front door behind him and locked it. By this time, all of the children were awake and joined Theresa in the living room. Then, the front door burst open and Bryan reentered the house. He walked to the couch, seized the couple's five-year-old son, and turned to leave. Theresa said that when she tried to stop him, he cursed her and "hit me so hard that I didn't know what he hit me with." She testified, "I thought he tore off part of my face, because I couldn't see out of my right eye. It just hurt so bad. And then I just felt the warmth and it kind of went numb." She said that her next clear memory was after the arrival of emergency medical personnel.

Deputy Leonard Shepperson was the first officer on the scene. He testified that he found Theresa slumped on the living room floor with a six-inch puddle of blood under her head. Shepperson said, "I actually thought I had a gunshot victim, because that's how much blood was on her face and her hair."

Bryan Nichols testified that he and Theresa had argued during several telephone conversations on December 13 regarding who was to have custody of the children during the holidays. He said that during these arguments, Theresa had threatened to come to Austin and take the children but he did not take the threat seriously. According to Bryan, he and the children went to bed that night at 9:00 p.m. He was awakened by someone sitting on his chest, choking him. Not knowing who it was and fearing for his safety, he seized the person's neck and, at the same time, pushed the person "very hard, almost with everything I had." The person fell to the floor, and Bryan saw that it was Theresa. He grabbed his cell phone and walked outside to call the police.

3

As he stood outside talking on the phone, Bryan saw Theresa standing on the front porch with the children. He saw something in her hand which he thought might be a knife. He testified that "[s]he had never done anything like this before" and he was concerned for the safety of the children. Bryan testified that when he started walking back toward the house, Theresa went back inside with the children and closed the front door. When he tried to open the door, he found that it was locked. He "put my shoulder into it and hit it as hard as I could." He testified that the door "kicked wide open" and struck Theresa on the head.

Before testimony began, the court ordered both parties not to mention or offer evidence of any other acts of violence or misconduct by either Bryan or Theresa without first obtaining an admissibility ruling from the court outside the jury's presence.[3] During the course of the trial, both sides violated the order to the court's obvious displeasure. During her testimony, Theresa was asked by the prosecutor what went through her mind as Bryan choked her. She answered, "I thought he was actually going to kill me this time." The court sustained the defense objection and instructed the jury to disregard the statement. The court warned the State and the witness, "If this were to occur again, I would entertain a motion for mistrial." During cross-examination, defense counsel asked Theresa if she had a registration for her car. The court interrupted and, out of the jury's hearing, admonished counsel that the question was a "blatant violation of my order about other things" and warned him that "[t]he next time I will hold you in contempt."

---

[3] The order was apparently made orally and does not appear in the record before us, which contains only a partial reporter's record of the trial. The existence of the order and its terms are not in dispute.

After Bryan testified that Theresa had attacked him and that he had acted in self-defense, the court ruled that the State would be allowed to cross-examine him about an incident in July 2003 in which he was arrested for and admitted assaulting Theresa. In response to the prosecutor's questions, Bryan acknowledged that he had been arrested, but he said that the accusation was false. He explained that he gave the inculpatory statement only because Theresa had promised him that she would not press charges. During redirect, defense counsel, referring to the 2003 incident, asked Bryan if "she ever pulled this same thing on any other individuals." The court sustained the State's objection and again admonished defense counsel about violating the pretrial order. Later, the court again admonished defense counsel after he asked Bryan if Theresa had "psychological disabilities."

### *The Mistrial*

During the second day of testimony, the court reconsidered its earlier ruling and allowed the defense to recall Bryan to testify that Theresa had falsely accused three other men of assaulting her. Bryan identified those men as Doug Polvo, Greg Wilson, and Stewart Garcia. Bryan testified that Theresa had admitted to him that her accusation against Garcia had been false. The prosecutor's cross-examination began as follows:

Q.  I want to talk to you first about Mr. Garcia. Do you know what year that was?

A.  That was early '90s, '93 somewhere.

Q.  All right. Wasn't Ms. Nichols about 18 years old when that happened?

A.  No, she was a little older than that. She was working in a strip bar.

5

The court immediately removed the jury. The State objected that the remark about Theresa working in a strip bar violated the court's order prohibiting evidence of other bad acts. The court sustained the objection and announced that "we are going to take a short break." After the break, and while the jury was still outside the courtroom, the State asked for a mistrial:

> Yes, Your Honor. I would ask for a mistrial under these circumstances. The defendant was well aware of the Court's repeated order not to mention this type of irrelevant information about the victim. We think that this type of violation is something we can't recover from. We believe it is unfairly prejudicial and has hurt the victim to the extent that a verdict in this case would not be just. I ask that you grant a mistrial without prejudice, based on the defendant's own misconduct.

The court asked defense counsel if he agreed to the mistrial motion, disagreed, or "[stood] neutral." Counsel replied, "I feel very strongly both ways, which is another way of saying neutral, Your Honor." The court then announced its ruling:

> All right. For the record, there have been numerous warnings as the record reflects, specifically about bringing in outside bad acts. The question and the answer just given, there can be no other conclusion that this was a studied and it was certainly a purposeful statement. This was not a slip of the tongue.
>
> I do not grant mistrials lightly. And in what, eight years, there's only been one. But based upon all the warnings we have had to date, and this statement recently, and despite my reluctance to tell the jury that they can go home this afternoon after what they've been through, it is obvious that this last statement is grounds for a mistrial. And I am going to grant the mistrial. And we'll set it back on the docket.

After the court announced its ruling, defense counsel stated, "Officially, I would ask the Court not to grant a mistrial. But I understand the Court's made its decision." He added, "We do object to the mistrial."

6

### *The Habeas Corpus Ruling*

Nichols applied for a writ of habeas corpus urging that the mistrial had not been justified by manifest necessity and that any further prosecution in this case would violate the constitutional guarantee against double jeopardy. The writ issued and after hearing the arguments of counsel, the trial court denied relief. The court gave three reasons for its ruling.

First, the court found that Nichols's conduct had been deliberate:

> The response "She's working in a strip bar" was certainly not in response to the question asked on cross-examination by the State. It certainly was unfairly prejudicial to the complainant and the State. And I believe as I have already stated in the record the statement obviously was meant to have an adverse impact on the jury, calculated to prejudice the jury in my opinion, and I do so find. I do believe that defendant knowingly and purposely injected error into the case and that's why I granted the mistrial.

Second, the court pointed out that the mistrial was declared only after careful consideration:

> A couple of other things that I think I need to comment on that were in the motion . . . I think you put in the writ that this . . . ruling was made immediately. I think the record reflects that in fact the ruling was not made until after there was a break of several minutes, and in fact was made not only after the break but after counsel was asked for input into the ruling prior to the ruling being made. So it was not in my opinion, and in fact I find that in fact a break was taken and all sides were asked for input.

Finally, the court was of the opinion that Nichols had consented to the mistrial or had failed to timely object:

> And that I think leads to my third point, I also think the record reflects that the objection for mistrial was waived and is untimely. I think the record reflects clearly that after the break the State made its Motion for Mistrial, defense was asked

7

for input, and . . . as I recall . . . defense counsel's response was "I stand neutral." After that statement was made the Court granted the mistrial and then only after that was the objection to the mistrial made. So I do believe not only was it untimely but also waived by that . . . .

### *Consent to Mistrial*

In two points of error, Nichols contends that the trial court erred by ruling that he waived any objection or consented to the mistrial. He further contends that, contrary to the trial court's ruling, his objection to the mistrial was timely. Nichols argues that a defendant is not required to object to a mistrial in order to preserve a former jeopardy claim if the mistrial was not authorized by law. *Hipple v. State*, 191 S.W. 1150, 1156 (Tex. Crim. App. 1917) (op. on reh'g); *see also Davis v. State*, 164 S.W.2d 686, 689 (Tex. Crim. App. 1942) (op. on reh'g). He further asserts that his attorney's statement that he was "neutral" did not constitute consent to the mistrial and that, in any case, counsel's consent was not effective as to him. *See Hipple*, 191 S.W. at 1155. Finally, Nichols urges that his attorney withdrew any consent he might have given and expressly objected to the mistrial before the court dismissed the jury. This, Nichols contends, was a timely objection to the mistrial, if any were needed to preserve his double jeopardy claim.

In a more recent opinion, the court of criminal appeals addressed the question of whether double jeopardy barred retrial in a case in which a mistrial was declared on the motion of defense counsel, but the trial court did not obtain the defendant's personal agreement. *Rios v. State*, 557 S.W.2d 87, 90 (Tex. Crim. App. 1977). Citing the principle that a defendant does not have the right to be both represented by counsel and to represent himself, the court held that a defendant need not be asked by the trial court if he personally approves of his attorney's motion for mistrial. *Id.* at

8

bound by the motion, it would follow that he need not personally concur in his attorney's consent to a mistrial in order to be bound by that consent.

The *Rios* court further held that it was "entirely logical" in that case to infer that the defendant had impliedly consented to the waiver of his double jeopardy claim, citing the Supreme Court's statement that the permissibility of a retrial following a mistrial does not depend on a knowing, voluntary, and intelligent waiver of a constitutional right. *Id.* (quoting *U. S. v. Dinitz*, 424 U.S. 600, 609 n.11 (1976)). Both the court of criminal appeals and this Court have held that a defendant's consent to a mistrial may be inferred from the totality of the circumstances. *Torres v. State*, 614 S.W.2d 436, 441 (Tex. Crim. App. 1981); *Allen v. State*, 656 S.W.2d 592, 595 (Tex. App.—Austin 1983, no pet.). Consent may be inferred from the defendant's failure to timely object to the mistrial, provided that the defendant was given an adequate opportunity to object. *Torres*, 614 S.W.2d at 441-42.

The trial record reflects that after sustaining the State's objection to Nichols's remark that Theresa had worked "in a strip bar," the court took a break of several minutes' duration. In light of what had happened, defense counsel could have anticipated that the State might move for a mistrial after the break. When the mistrial motion was in fact made, counsel was expressly asked by the trial court if he agreed or disagreed with the mistrial motion, or if he was neutral on the question. Given this opportunity to speak against a mistrial, counsel responded that he was "neutral." It is reasonable to infer from this that Nichols consented to the mistrial. *See id.*

9

Nichols argues that if his attorney initially consented, that consent was revoked when counsel later objected to the mistrial before the court discharged the jury. The State responds by pointing to the general rule that an objection, to be timely, must be made at the earliest opportunity after the ground of objection becomes apparent. *See Lagrone v. State*, 942 S.W.2d 602, 618 (Tex. Crim. App. 1997); *Polk v. State*, 729 S.W.2d 749, 753 (Tex. Crim. App. 1987). It is clear from the record that Nichols did not object to the State's mistrial motion at the earliest opportunity. To the contrary, his attorney expressly declined the opportunity to object and announced his neutrality with regard to the motion. It was only after the court granted the motion that the defense voiced its pro forma objection to the mistrial. Under the circumstances, the State correctly argues that the objection came too late.

Nevertheless, Nichols did object to the mistrial before the jury was discharged. Although the court had announced its ruling granting the State's motion, it still had the opportunity to reconsider the ruling in light of the objection and continue the trial. Because the objection might be considered timely, we will address the merits of Nichols's double jeopardy argument.

### *Manifest Necessity*

The constitutional double jeopardy protection embraces the defendant's right to have his trial completed by a particular tribunal. *Arizona v. Washington*, 434 U.S. 497, 503 (1978). Thus, when a mistrial is declared over the defendant's objection after the jury is sworn, a retrial is barred by double jeopardy unless there was a manifest necessity for the mistrial. *Id.* at 505; *Fierro*, 79 S.W.3d at 56. As a general rule, manifest necessity exists when the circumstances render it impossible to reach a fair verdict, when it is impossible to proceed with trial, or when the verdict

10

would be automatically reversed on appeal because of trial error. *Ex parte Bruce*, 112 S.W.3d 635, 640 (Tex. App.—Fort Worth 2003, pet. ref'd, untimely filed). Before granting a mistrial, a trial court must determine whether alternative courses of action are available and, if so, choose one that is less drastic than a mistrial. *Id*. We review a trial court's decision to grant a mistrial for an abuse of discretion. *Id*.

Nichols argues that the trial court granted the State's motion for mistrial without considering a less drastic alternative. He points out that during jury selection, the prosecutor asked the panelists if they could agree that all crime victims are entitled to the protection of the law. She asked if any members of the panel would "hold it against the victim" if he or she had "an alcohol problem, drug problem, they may have had affairs, they may have been in a profession that you certainly wouldn't be in, such as a stripper or a prostitute or a pimp." All of the panelists indicated that they could put aside any distaste for the victim's personal choices and treat the victim fairly. Nichols urges that under the circumstances, an instruction to disregard the offending comment would have been sufficient to cure any prejudice to the State and that the mistrial was, therefore, an abuse of discretion.

In *Washington*, the Court observed that the "manifest necessity" standard cannot be applied "mechanically or without attention to the particular problem confronting the trial judge. Indeed, it is manifest that the key word 'necessity' cannot be interpreted literally; instead, contrary to the teaching of Webster, we assume that there are degrees of necessity and we require a 'high degree' before concluding that a mistrial is appropriate." *Washington*, 434 U.S. at 506 (footnotes

11

omitted). In that case, the trial court ordered a mistrial after the defendant's lawyer made improper and prejudicial remarks during his opening statement to the jury. *Id*. at 510. The Court wrote:

> We are persuaded that, along the spectrum of trial problems which may warrant a mistrial and which vary in their amenability to appellate scrutiny, the difficulty which led to the mistrial in this case . . . falls in an area where the trial judge's determination is entitled to special respect.
>
> . . .
>
> We recognize that the extent of the possible bias cannot be measured, and that . . . some trial judges might have proceeded with the trial after giving the jury appropriate cautionary instructions. In a strict, literal sense, the mistrial was not "necessary." Nevertheless, the overriding interest in the evenhanded administration of justice requires that we accord the highest degree of respect to the trial judge's evaluation of the likelihood that the impartiality of one or more jurors may have been affected by the improper comment.

*Id*. at 510-11. The Court went on to point out that the "trial judge did not act precipitately in response to the prosecutor's request for a mistrial. On the contrary, evincing a concern for the possible double jeopardy consequences of an erroneous ruling, he gave both defense counsel and the prosecutor full opportunity to explain their positions on the propriety of a mistrial." *Id*. at 515-16. The Court concluded that the record supported the conclusion that the trial court had exercised sound discretion in the matter. *Id*. at 516.

Nichols primarily relies on the opinion in *Maydon v. State*, 141 S.W.3d 851 (Tex. App.—Corpus Christi 2004, no pet.). In *Maydon*, the trial court declared a mistrial on its own motion after sustaining the State's objections to a leading question and to an alleged irrelevant question. *Id*. at 854-55. The court did not give the parties an opportunity to address the propriety of declaring a mistrial. *Id* at 855. The court of appeals found that the decision to grant the mistrial

12

"was sudden and unanticipated" by either the State or the defense, that the trial court was confused as to the nature of the State's objections that preceded the mistrial, and that the trial court gave no consideration to any less drastic alternative. *Id*. at 857. The court of appeals concluded that no manifest necessity for the mistrial was shown by the record and that the trial court had abused its discretion. *Id*. at 858.

The case before us is much closer to *Washington* than it is to *Maydon*. The record shows that the trial court clearly and repeatedly instructed the parties that they were not to adduce extraneous misconduct testimony without first obtaining a ruling on its admissibility. Far from precipitately declaring a mistrial, the trial court repeatedly sustained objections to violations of its evidentiary order, instructed the jury to disregard, and admonished counsel for both parties that they were courting a mistrial. After taking a break in the proceedings and before declaring the mistrial, the court gave Nichols an opportunity to argue against it. Nichols chose to remain silent. The court's statements at trial and at the habeas corpus hearing reflect that the court carefully considered its decision and granted the mistrial motion only as a last resort. Unlike this Court, the trial court was able to see and hear Nichols's statement and judge its potential impact on the jury. We are persuaded that the trial court exercised sound discretion in its handling of the problem created by Nichols's prejudicial remark and that its mistrial order was supported by the required high degree of necessity. *See Bruce*, 112 S.W.3d at 641-42 (finding no abuse of discretion in declaring mistrial after defense counsel violated limine order and told jury in opening statement that complainant had made previous false accusations of sexual misconduct).

13

The points of error are overruled, and the order denying relief on Nichols's writ of habeas corpus is affirmed.

_____

Jan P. Patterson, Justice

Before Justices Patterson, Puryear and Pemberton

Affirmed

Filed:   October 11, 2007

Do Not Publish

14