JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant, Manuel Rodriguez, appeals his conviction after a jury trial in the Cuyahoga County Court of Common Pleas. Finding error in the proceedings below, we reverse and vacate his conviction.
 {¶ 2} Rodriguez was charged with one count of rape and one count of kidnapping. The alleged victim was his 11-year-old stepdaughter. He pled not guilty, and a jury trial ensued.
 {¶ 3} At trial, the trial court, sua sponte, declared a mistrial, over defense counsel's objection, during the cross-examination of the victim. Following the first trial, but prior to the second trial, Rodriguez filed two motions to dismiss based on double jeopardy. Both motions were denied; however, the trial court reversed its earlier evidentiary ruling upon which the mistrial had been based. Rodriguez then filed a motion to reconsider the double jeopardy issue in light of the trial court's new evidentiary ruling. That motion was denied and a second trial ensued.
 {¶ 4} The alleged victim testified that she was born on October 2, 1992, and that she lived with her mother and stepfather, appellant Rodriguez, in an apartment in Parma. She agreed that she and Rodriguez had a good relationship prior to the alleged incident.
 {¶ 5} The victim testified that on the date of the alleged incident, she, her mother, and Rodriguez went to the video store, rented two movies, and picked up a pizza. The victim testified that her mother then went to play bingo with a *Page 4 
friend and she stayed home with her stepfather, eating pizza and watching movies. During the first trial, the victim testified that her mother did not go with them to get pizza or videos.
 {¶ 6} The victim stated that while they were watching a movie, Rodriguez got up, unzipped his pants, and raped her. She could not remember what she was wearing: in a police statement she said she was wearing pants; at trial she said she had her nightgown on. The victim testified that, "[h]e took out his penis and penetrated my vagina." She said it happened on the couch in the living room and that she could not get up and walk away. The victim testified that she tried to push Rodriguez off her and told him to stop. When he was finished, the victim went to her room and cried. She did not tell anyone about the incident until approximately ten days later, because she was afraid her mother would not believe her.
 {¶ 7} On December 29, 2003, the victim wrote a note to her mother telling her that Rodriguez "did exactly what Brian did." The victim was referring to her stepbrother, whom she had previously accused of raping her. At first, the victim's mother did not believe her. Nevertheless, her mother took the victim to her counselor, Dorothy Dickens, and Dr. David Bar-Shein, at MetroHealth Medical Center. In addition, the victim spoke with a police officer and a social worker from Children and Family Services. *Page 5 
 {¶ 8} The victim's mother also confronted Rodriguez, who told her that he did not do anything to the victim and would not hurt her. The victim and the victim's mother moved out of the apartment and in with the victim's grandmother.
 {¶ 9} On the stand, the victim's mother testified that at first she did not believe her daughter and had signed an affidavit stating that her daughter could not distinguish between fantasy and reality. She also testified that she provided defense counsel with two pages from the victim's diary. One page indicated that the victim believed that she and her mother had "telepathic, E.S.P., and telekinetic abilities." The second page was a letter to Santa, wherein the victim wished she could give her mother a diamond ring and have her mother think it was from her and Rodriguez. The letter to Santa was written four days after the alleged incident.
 {¶ 10} The victim's mother testified that despite moving out, she began seeing Rodriguez again in March 2004, which upset the victim. The mother stopped seeing him in October 2004.
 {¶ 11} Dorothy Dickens testified that she is a licensed social worker and works for the MetroHealth Medical Center Alpha Clinic. Ms. Dickens originally met the victim when the victim alleged she had been molested by her stepbrother. Ms. Dickens became involved with the victim again after the alleged incident with Rodriguez. She testified that the victim's low self-esteem and poor *Page 6 
relationships with friends can be consistent with being a victim of sexual abuse. Captain Robert DeSimone of the Parma Police Department testified that he interviewed Rodriguez, who denied having intercourse with the victim.
 {¶ 12} Lisa Prokopius testified that she works as a social worker for the Cuyahoga County Department of Children and Family Services, where she investigates allegations of sexual abuse. She did the initial investigation involving the victim and her stepbrother, which did not result in criminal charges. Ms. Prokopius also investigated the incident involving the victim and Rodriguez. She testified that Rodriguez spoke freely with her when she interviewed him, telling her that the victim's allegations were untrue.
 {¶ 13} Dr. Bar-Shain testified that he works at MetroHealth Medical Center in the Pediatric Division, as well as at the Alpha Clinic. Dr. Bar-Shain testified that he examined the victim after both incidents. He indicated that the victim was tearful when recounting what happened with Rodriguez. Dr. Bar-Shain testified that the physical exam was normal, but that the victim's symptoms, which included secondary enuresis and depressed mood, were consistent with sexual abuse. He diagnosed the victim with "probable abuse," because of the child's history and the physical exam.
 {¶ 14} Three individuals testified on Rodriguez's behalf, indicating that he had a reputation in the community as an honest and decent person. *Page 7 
 {¶ 15} During deliberations, the jury informed the court that it was deadlocked, five for guilty and seven for not guilty. After the trial court read the Howard charge, the jury returned a guilty verdict on both counts.
 {¶ 16} Rodriguez now appeals, advancing two assignments of error for our review. The first assignment of error states:
 {¶ 17} "The trial court abused its discretion and erred in, sua sponte, declaring a mistrial over defense objection and in the absence of a manifest necessity, and the subsequent retrial of appellant violates the double jeopardy clauses of the Federal and State Constitutions."
 {¶ 18} Rodriguez argues that there was no manifest necessity for the trial court to sua sponte declare a mistrial and the trial court failed to consider less drastic alternatives. Additionally, Rodriguez argues that because the trial court erred when it declared a mistrial, his second trial was barred by double jeopardy.
 {¶ 19} The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution, made applicable to the states through theFourteenth Amendment, protects a criminal defendant from multiple prosecutions for the same offense. Oregon v. Kennedy (1982),456 U.S. 667, 671.
 {¶ 20} In determining whether the trial court properly exercised its discretion in declaring a mistrial without the request or consent of the defendant, reviewing courts look to whether (1) there was a manifest necessity or high degree of necessity for ordering a mistrial, or (2) the ends of public justice would otherwise be defeated. *Page 8 North Olmsted v. Himes, Cuyahoga App. Nos. 84076 84078,2004-Ohio-4241, citing Arizona v. Washington (1978), 434 U.S. 497,505-506; State v. Widner (1981), 68 Ohio St.2d 188, 189-190. "Where the trial judge sua sponte declares a mistrial, double jeopardy does not bar retrial unless the judge's action was instigated by prosecutorial misconduct designed to provoke a mistrial, or the declaration of a mistrial constituted an abuse of discretion." State v. Glover (1988),35 Ohio St.3d 18, 517 N.E.2d 900.
 {¶ 21} In this instance, the court sua sponte declared a mistrial and there is no allegation or evidence of prosecutorial misconduct leading to this ruling. We therefore review the trial court's decision for an abuse of discretion.
 {¶ 22} As explained in State v. Ross (Dec. 31, 2002), Summit App. No. 20980, 2002-Ohio-7317, at ¶ 26:
 {¶ 23} "* * * [When] we use the term [abuse of discretion], it encompasses multiple layers of inquiry. In the course of such review, `we accept the trial court's factual findings only to the extent that they are not clearly erroneous.' In contrast, we evaluate the [trial] court's articulation of applicable legal rules de novo, cognizant that a mistake of law is equivalent to an abuse of discretion. Only then do we inquire whether, in view of all the facts and circumstances, the trial court's finding of a manifest necessity to discharge the jury and declare a mistrial constitutes a misuse of its discretion." (Internal citations omitted.) A trial court abuses its discretion by declaring a mistrial without considering any alternatives. United States v.Jorn (1971), 400 U.S. 470; Washington, supra. To exercise sound discretion in *Page 9 
determining that a mistrial is necessary, the trial judge should allow both parties to state their positions on the issue, consider their competing interests, and explore some reasonable alternatives before declaring a mistrial. Ross, supra, citing Washington, supra.
 {¶ 24} In this case, the trial court sua sponte declared a mistrial because it believed that the defense attorney purposefully elicited testimony from the victim that the court had ruled inadmissible under the rape shield law. In Rodriguez I (the mistried case), the court, in ruling on a motion in limine based upon the rape shield law, established the parameters of permissible examination of the victim in light of the defense theory that the victim made a false allegation of rape against her stepfather because a previous allegation of rape against her stepbrother Brian had gone unredressed. The court ruled at Tr. 29 that:
 {¶ 25} "You can inquire without getting into the sexual. You could ask whether she's, you know, was she mad at her brother because something happened, is that what caused her to, you know, but if you start bringing up the fact that it was sexual in nature, then you're running afoul of the rape shield law."
 {¶ 26} After further defense inquiry into the permissible parameters of cross-examination, the court clarified its ruling at Tr. 43:
 {¶ 27} "You can confront her and ask her in essence whether she was mad about something her brother did, she didn't get the result or satisfaction she desired, and therefore she made this up against Mr. Rodriguez. I think that is permissible as *Page 10 
long as it doesn't go into the facts or the allegations made in the other case, any sexual conduct, anything that is not to come before the jury * * *."
 {¶ 28} In response, the prosecutor assured both the court and defense counsel that, "I have already advised the victim and her mother that we are not to discuss anything with regards to Brian or the incident with Brian because of your ruling * * *."
 {¶ 29} Nonetheless, despite the court's ruling, and regardless of the prosecutor's admonition to the witnesses, upon the prosecutor's questioning, the victim spontaneously responded as follows:
 {¶ 30} "Q: How did you tell your mom?
 {¶ 31} "A: I wrote it in a letter.
 {¶ 32} "Q: All right. And in that letter did you — what did you tell her with regards to [appellant]?
 {¶ 33} "A: I told her that he did the same thing that my brother had done to me.
 {¶ 34} "Q: And what did your mom do when you told her?
 {¶ 35} "A: She would do anything like any other mom. She took me to my counselor and told me to tell her what I told my mom." Tr. 65.
 {¶ 36} After this testimony had been elicited, the defense (apparently at sidebar) argued that the door had been opened by the state, and that the defense should be permitted to explore the specifics upon cross-examination. The court ruled that "it was not elicited intentionally by the prosecutor" and directed defense *Page 11 
counsel that "you can cross-examine her on the same parameters we talked about prior to trial."
 {¶ 37} Upon cross-examination, the defense and victim then had the following colloquy:
 {¶ 38} "Q: How old is Brian?
 {¶ 39} "A: 18 or 19 now.
 {¶ 40} "Q: So a year and a half or so ago, he would have been 17 or 18?
 {¶ 41} "A: Yes.
 {¶ 42} "Q: Did you tell anyone what happened between you and Brian?
 {¶ 43} "A: Yes.
 {¶ 44} "Q: Whom did you tell?
 {¶ 45} "A: A friend named Lindsay. She had gone through it maybe seven times with her cousin or brother. I'm not sure which, and she asked me if I've ever been molested. I said what does it mean. She said raped. I said yes. And I didn't know what to do, whether to tell my father or just leave it alone. And her and her sister helped me tell my father."
 {¶ 46} There was no objection made to this testimony, nor does the transcript reveal that anyone attempted to "cut the victim off;" in fact, subsequent to this testimony, two more questions were asked and answered before the court ordered counsel to approach sidebar. The judge chastised defense counsel for his questioning and counsel defended that his questions were proper under the court's parameters. Defense counsel then launched into another evidentiary issue. After *Page 12 
hearing argument on that evidentiary issue, and without argument on the rape shield issue, the court declared a mistrial and discharged the jury. The defense objected, and its objection was overruled. The defense raised the issue of double jeopardy in asking the court to reconsider its ruling; the court directed the defense to prepare a motion. It is upon the court's denial of that motion that this appeal is based.
 {¶ 47} Ohio's rape shield law, R.C. 2907.02, prohibits introducing specific instances of the victim's sexual activity and reputation unless they involve evidence of the origin of semen, pregnancy or disease, or the victim's past sexual activity with the offender, and then only to the extent that the trial court finds the evidence is material to a fact at issue, and its prejudicial or inflammatory nature does not outweigh its probative worth. In State v. Boggs (1992), 63 Ohio St. 3d 418, the Ohio Supreme Court outlined the procedure for trial courts when faced with a situation like the one at bar. The Boggs court found that when an alleged victim admits on cross-examination that she has made prior accusations, the trial judge must conduct an in-camera hearing to ascertain whether sexual activity was involved. If sexual activity was involved, then the testimony is inadmissible pursuant to R.C. 2907.02. However, if the trial judge finds there was a false accusation and there was no sexual activity involved, then the rape shield statute does not prohibit introduction of this evidence. Thus, the evidence would be permitted under Evid.R. 608 because it is probative of truthfulness or untruthfulness. Boggs at 421.
 {¶ 48} Here, prior to trial, the court examined the victim's allegations involving her stepbrother and determined that the allegations were not false and involved *Page 13 
sexual activity. The trial court ruled that testimony concerning the sexual activity was inadmissible. See State v. Pettrey (Oct. 23, 2000), Stark App. No. 99CA277. Nevertheless, because R.C. 2907.02 prohibits only evidence of "sexual activity" of the victim, the court ruled that it did not prohibit inquiry into the other facets of the issue between Brian and the victim.
 {¶ 49} During cross-examination of the victim, the trial court held a sidebar conference and chastised defense counsel for eliciting what the court believed to be impermissible testimony. At sidebar, the court asked the state if it wanted a mistrial; the state did not respond. Defense counsel argued that he did not elicit impermissible testimony, that the testimony had been spontaneously and unresponsively offered by the victim, and he argued there was no objection about his questioning from the state. The court stated: "You need to move on. I'll consider whether there is going to be a mistrial." After several other questions had been asked and answered, and during another sidebar apropos of another issue, the court stated:
 {¶ 50} "Well, here's a bigger problem than your cross-examination on telekinetic powers. Under 2907.02, under (D), it says, `[E]vidence of specific instances of the victim's sexual activity shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender.' You specifically went in and elicited testimony about an incident last summer, that's impermissible. I think at this point I'm going to declare a mistrial." *Page 14 
 {¶ 51} The court then declared a mistrial and dismissed the jury.
 {¶ 52} A review of the transcript, however, reveals that the defense attorney did not ask any question outside the parameters set by the court for permissible questioning. The victim's testimony regarding her sexual activity with her stepbrother was not responsive to the question posed by counsel, and certainly appears on the transcript to be spontaneous.
 {¶ 53} Although we recognize the extreme pressure the trial court is under when making these weighty decisions, it still must exercise sound discretion and follow the proper procedures. In order to exercise sound discretion in determining that a mistrial is necessary, the trial judge should allow the defense and the prosecution to state their positions on the issue, consider the competing interests, and explore some reasonable alternatives before declaring a mistrial. Arizona v. Washington,434 U.S. at 514-516. In evaluating the trial court's exercise of discretion, a reviewing court must look at all of the surrounding circumstances, including what was expressed by the parties at the time the trial court considered its options. Ross, supra.
 {¶ 54} Although defense counsel did argue that he did not elicit impermissible testimony, the record in this case indicates that the trial court did not allow the parties to state their positions regarding the mistrial and did not make an inquiry into any reasonable alternatives prior to declaring a mistrial.[1] The court did not even *Page 15 
request that the allegedly offending questions be read back and compared against the ruling in the motion in limine. Accordingly, we are forced to conclude that the trial court's action was an abuse of discretion.
 {¶ 55} Because the trial court abused its discretion in declaring a mistrial, we also find that the retrial was barred by double jeopardy. See Himes, supra (finding an abuse of discretion in declaring a mistrial when a curative instruction would have sufficiently cured any possible prejudice); State v. Coon, Cuyahoga App. No. 79641, 2002-Ohio-1813 (finding an abuse of discretion because the court failed to consider less drastic alternatives); State v. Morgan (1998), 129 Ohio App.3d 838
(finding an abuse of discretion because the trial court failed to cure or otherwise determine the effect of the purportedly tainted evidence).
 {¶ 56} Rodriguez's first assignment of error is sustained. Rodriguez's second assignment of error is therefore moot. See App.R. 12(A)(1)(c).
Judgment reversed and conviction vacated.
 CHRISTINE T. McMONAGLE, J. *Page 16 
ANTHONY O. CALABRESE, JR., J., CONCURS. SEAN C. GALLAGHER, P.J., CONCURS IN JUDGMENT ONLY WITH SEPARATE CONCURRING OPINION.
[1] Prior to trial during motion practice, defense counsel raised a concern that a treating physician might inappropriately testify that he believed that victim to be telling the truth because he found the history as she gave it to him "internally consistent." Upon this concern, he requested a voir dire of the doctor. The Court ruled, "I don't know that we're going to voir dire on it. I have not had anyproblems with juries disregarding the testimony that was marked-thatshould not have been allowed, whether it was because somebody blurtedout or maybe it was not responsive to the question." Tr. 23. (Emphasis added). The court obviously had faith that a curative instruction would alleviate problems caused by a spontaneous or unresponsive answer. Yet it did not use a curative instruction in the instant case.