J-S07017-19

2019 PA Super 263

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| JEROME ANTHONY KENNEDY, JR. | : | |
| | : | |
| Appellant | : | No. 1038 MDA 2018 |

Appeal from the Order Entered June 15, 2018
In the Court of Common Pleas of Lycoming County Criminal Division at
No(s):  CP-41-CR-0001924-2016

BEFORE:   OLSON, J., McLAUGHLIN, J., and PELLEGRINI*, J.

OPINION BY McLAUGHLIN, J.:                    **FILED AUGUST 27, 2019**

Jerome Anthony Kennedy, Jr. appeals from the order denying his motion
to dismiss, which alleged his prosecution violated the Double Jeopardy Clauses
of the United States and Pennsylvania Constitutions.[1] He argues the trial court
abused its discretion in finding there was a manifest necessity for a mistrial
during his first trial. We affirm.

The trial court set forth the following procedural history:

> The Commonwealth charged [Kennedy] with delivery of a
> controlled substance, three counts of possession with intent
> to deliver a controlled substance, two counts of possession
> of a controlled substance, two counts of possession of drug

_____

\*   Retired Senior Judge assigned to the Superior Court.

[1] The Fifth Amendment of the United States Constitution provides, in relevant part, that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb[.]" U.S. Const. Amend. V. Similarly, Article I, § 10 of the Pennsylvania Constitution provides that "No person shall, for the same offense, be twice put in jeopardy of life or limb[.]" Pa. Const. Art. I, § 10.

paraphernalia, and one count of criminal use of a communication facility.[2]

A jury trial began on December 7, 2017. During the course of the trial, jurors reported an incident that happened on the elevator when they were leaving for their lunch break. Before the elevator doors closed, two of [Kennedy's] female supporters pushed their way onto the already full elevator. When the elevator arrived at the lobby, the taller lady (who was subsequently identified as [Kennedy's] girlfriend, Alexis Lucas) turned away from the elevator doors and toward the six or seven jurors who were on the elevator. Ms. Lucas put her arms out, blocking the jurors and other people who were on the elevator from exiting. Ms. Lucas did this for approximately 15 seconds, and then she turned around, walked out of the elevator, and slammed the outside door.

Trial Court Opinion, filed November 8, 2018, at 1-2 ("1925(a) Op.").

The court held an *in camera* hearing, where jurors expressed that they did not believe they would hold the incident against Kennedy, were unsure whether they would be able to fairly consider the credibility of Lucas, questioned whether Lucas would be in the courtroom, and felt that Lucas's actions were intimidating:

THE COURT: Would it – would that intimidate any of you to the point that you think it might impact your judgment for or against the defendant? One of these women – well that's the first question. Would it, and there's no right answer to this, there's just an honest one. Would any of you feel that because of that it might interfere in your ability to render a fair – a decision based on the evidence and the law?

JUROR: No, I reported it solely because I deal with that every single day when I'm at school, and it's bullying, and I

---

2 35 P.S. §§ 780-113(a)(30), 780-113(a)(16), 780-113(a)(32), and 18 Pa.C.S.A. § 7512(a), respectively. The Commonwealth also charged Kennedy with one count of persons not to possess firearms, 18 Pa.C.S.A. § 6105(a)(1).

- 2 -

just – I brought it to the attention of the Court because it's unacceptable.

THE COURT: Okay. Will you guys hold it against the defendant then?

JUROR: No.

THE COURT: Okay.

JUROR: Is there something that we can do that she can't be here?

THE COURT: Well that's the next question. What happens if she testifies? Are you going to be able to judge her credibility fair[ly] and impartially? I am not going to put words in your mouth, but it would be tough for me.

JUROR: Yeah.

THE COURT: Okay, so we have one yes[. Y]ou can judge it, or no?

JUROR: If she started talking[,] I really don't know how I would feel.

THE COURT: No, my point is, did what she do at this point cause you concern, or can you listen to her testimony and judge her credibility and the weight of her testimony the same way you would someone else, or would you have – would you feel like you –

JUROR: I just can't answer that right now.

THE COURT: Okay.

JUROR: I don't know.

THE COURT: Okay.

JUROR: I'd have to really think about that.

THE COURT: All right. How about the rest of you?

JUROR: I – I think I would – I would have a tough time overlooking that, I don't know.

THE COURT: Fair enough. And that's actually what I'm asking, you actually said it better than I could. Would you

have – we have a couple yes, and now we have at least three yeses. Anybody else? At least three yeses. Okay. Fair enough. That would be difficult to – I would think to overlook it under these circumstances.

JUROR: It would certainly be an influence, I would have to say. One, I don't know which way, but again –

THE COURT: It would be an influence one way of the other?

JUROR: Probably, yeah.

JUROR: Because I would be thinking, you know.

THE COURT: Right, this is the woman that said this and, you know – well then let's go back to question number one. Would you be thinking about it when you're in there rendering your verdict, assuming that she doesn't testify? Are you thinking, man she was a real jerk to us and you know, she's obviously with the defendant, and so that guy's guilty, or the opposite?

JUROR: I think I could put it aside.

JUROR: What she did is –

THE COURT: All right. Fair enough.

. . .

[ASSISTANT DISTRICT ATTORNEY]: The only question I would have is, I think the tipstaff indicated that somebody indicated that they felt as if they were – they were intimidated by the action.

THE COURT: Could be intimidated.

JUROR: It was intimidating.

JUROR: That's what she was – she was trying to be intimidating.

THE COURT: Okay. So she was trying to be intimidating, but all – none of you would use that one way or the other . . . in reaching your verdict?

N.T., 12/7/17, at 93-99.

After the jurors left the courtroom, the court discussed the situation with counsel. Defense counsel stated there was a 75% chance that he would call Lucas as a witness. *Id.* at 100. The trial court noted that as the jurors were leaving, one juror asked, "[W]ell is she still going to be out there and still looking at us?" Defense counsel pointed out that the juror did not respond when the court asked if the jurors would hold the incident against Kennedy. *Id.* The trial court declared a mistrial. Neither party had asked it to do so. It reasoned that the jury was not capable of deciding the case fairly and impartially. *Id.* at 102. Kennedy did not object.

Following the mistrial, defense counsel filed a motion to withdraw. The trial court granted the motion and appointed an assistant public defender to represent Kennedy. On April 23, 2018, Kennedy filed a Motion to Dismiss Pursuant to Pa.R.Crim.P. 587(B), claiming re-prosecution violated the Double Jeopardy clauses of the United States and Pennsylvania Constitutions. Kennedy argued that there was not a manifest necessity for the court to declare a mistrial *sua sponte,* and it should have considered less drastic measures, including waiting to see if Kennedy would call Lucas to testify. On May 31, 2018, following an argument, the court denied the motion. Kennedy filed a Notice of Appeal.

Kennedy raises the following issue on appeal: "Whether the trial court erred in denying [Kennedy's] motion to dismiss based on [Kennedy's] constitutional right against double jeopardy?" Kennedy's Br. at 7.

Before we can reach the merits of Kennedy's claim, we must determine whether we have jurisdiction over the order denying his Motion to Dismiss.

An order denying a motion to dismiss on double jeopardy grounds may be appealable as a collateral order under Pennsylvania Rule of Appellate Procedure 313(b), if the trial court has determined that the motion is not frivolous. **See Commonwealth v. Taylor**, 120 A.3d 1017, 1021 (Pa.Super. 2015) (citing **Commonwealth v. Brady**, 508 A.2d 286, 291 (Pa. 1986)). Here, prior to the filing of the Notice of Appeal, the trial court did not make a finding as to whether Kennedy's Motion to Dismiss was frivolous. We therefore remanded to the trial court for it to make that determination. The trial court on remand concluded that it was not. Our jurisdiction is therefore proper. **See Taylor**, 120 A.3d at 1022-23.

We next address whether Kennedy has waived his challenge to the grant of a mistrial because he did not object when the trial court granted the mistrial. A defendant's "mere acquiescence to the *sua sponte* grant of a mistrial by the trial judge is not sufficient to waive his double jeopardy claims." **Commonwealth v. McCord**, 700 A.2d 938, 942 (Pa.Super. 1997); **accord Commonwealth v. Rivera**, 715 A.2d 1136, 1138 (Pa.Super. 1998). We therefore find that Kennedy did not waive his claim.

We will now address the merits of Kennedy's claim. Kennedy argues the trial court declared the mistrial prematurely. He notes that the jurors stated that they would not hold Lucas's behavior against Kennedy when rendering a verdict, and defense counsel was unsure whether he would call Lucas as a

witness. He contends the court should have waited to see whether defense counsel called Lucas before declaring a mistrial, and if she in fact testified, the trial court could have issued a curative instruction, rather than grant a mistrial. He maintains that because the court did not take such measures, the double jeopardy doctrine bars retrial.

We review a trial court's decision to declare a mistrial due to a showing of manifest necessity for an abuse of discretion. **Commonwealth v. Walker**, 954 A.2d 1249, 1254 (Pa.Super. 2008) (*en banc*) (citing **Commonwealth v. Kelly**, 797 A.2d 925 (Pa.Super. 2002)).

Pennsylvania Rule of Criminal Procedure 605(B) provides: "(B) When an event prejudicial to the defendant occurs during trial only the defendant may move for a mistrial; the motion shall be made when the event is disclosed. Otherwise, the trial judge may declare a mistrial only for reasons of manifest necessity." Pa.R.Crim.P. 605(B). "Where there exists manifest necessity for a trial judge to declare a mistrial *sua sponte*, neither the Fifth Amendment to the United States Constitution, nor Article I, § 10 of the Pennsylvania Constitution will bar retrial." **Walker**, 954 A.2d at 1254 (quoting **Kelly**, 797 A.2d at 936). Therefore, to determine whether double jeopardy bars a re-trial following a *sua sponte* grant of a mistrial, we must determine whether manifest necessity existed for the mistrial.

Courts "do not apply a mechanical formula in determining whether a trial court had a manifest need to declare a mistrial." **Kelly**, 797 A.2d at 937. Whether a trial court should grant a mistrial after jeopardy has attached is not

a decision "to be lightly undertaken, since the defendant has a substantial interest in having his fate determined by the jury first impaneled." **Walker**, 954 A.2d at 1254 (quoting **Kelly**, 797 A.2d at 936). Further, prior to granting a mistrial, a trial court should consider whether less drastic measures are available. **See id.** We have stated that "failure to consider if there are less drastic alternatives to a mistrial creates doubt about the propriety of the exercise of the trial judge's discretion" and may be grounds "for barring retrial because it indicates that the court failed to properly consider the defendant's significant interest in whether or not to take the case from the jury." **Id.** at 1254-55 (quoting **Kelly**, 797 A.2d at 936). When determining whether manifest necessity exists any doubt must "be resolved in favor of the defendant." **Id.** at 1255 (quoting **Kelly**, 797 A.2d at 937).

"[T]he trial court is in the best position to gauge potential bias" and we defer to the trial court "when the grounds for the mistrial relate to jury prejudice." **Id.** at 1256 (quoting **Arizona v. Washington**, 434 U.S. 497, 513–14 (1978)). We defer to the trial court because it "has had the opportunity to observe the jurors, the witnesses, and the attorneys and evaluate the scope of the prejudice." **Id.** (quoting **Washington**, 434 U.S. at 513-514).

Kennedy relies on **Kelly** for his contention that the court abused its discretion when it failed to take a less drastic alternative—waiting to see if defense counsel would call Lucas as a witness. In **Kelly**, the trial court granted a mistrial during a jury trial because the trial court was concerned the court could not act impartially toward the Commonwealth, as it was frustrated with

the Commonwealth's "bombastic" style, and feared that this frustration would impact the jury. 797 A.2d at 927. We concluded the court acted prematurely, and that "manifest necessity for a mistrial was not demonstrable at the time the court *sua sponte* ended the trial." ***Id.*** at 940. We stated that "less severe remedies" existed, such as threatening the assistant district attorney with contempt "should he not curb his 'volatile' style of litigation," or removing him as the prosecuting attorney. ***Id.*** at 942. We concluded that, although the trial court had a concern about the appearance of its bias and its effect on the jury, "there remained the real possibility that the negative impact of the court's opinion of the Commonwealth's style of prosecution could have been prevented and that the jury could have ruled impartially, in spite of the trial judge's frustration." ***Id.*** We therefore concluded that the appellants' "valued constitutional right to have their trial completed before the first jury empaneled" should not "have been subordinated to the public interest." ***Id.***

Here, the trial court concluded:

> Only one juror indicated that he or she could put the matter aside if Ms. Lucas was called as a witness. The other five or six jurors either indicated that the incident would influence their ability to judge Ms. Lucas' credibility or they did not know if they could consider Ms. Lucas' credibility fairly and impartially. The ones who said it would be an influence could not say which way it would influence their decision. Too many jurors were impacted by the incident for the court to excuse the affected jurors and continue the trial. . . .
>
> Furthermore, it is clear that several jurors felt unnerved and intimidated by Ms. Lucas' actions. Those jurors were not only concerned by the prospect of Ms. Lucas being called as a witness, but also by her mere presence. Therefore, waiting

to see if Ms. Lucas was called as a witness was not going to solve the problem.

The incident and its impact made declaring a mistrial a manifest necessity. The ends of public justice would be defeated by proceeding in a trial with a jury whose members were unnerved and intimidated by the actions of [Kennedy's] girlfriend. It was unclear which party the incident would hurt or hinder, because most of the jurors could not overlook the incident but they did not know which way it would influence their decision. There were an insufficient number of unaffected jurors to proceed with the trial. Therefore, the court was left with no choice but to declare a mistrial.

1925(a) Op. at 4-5.

The trial court did not abuse its discretion. Here, unlike in **Kelly**, the court knew of the impact the incident had on the jurors. The trial court held a hearing, in which it learned that jurors felt intimidated by Lucas's actions and that they were not sure that they would be able to judge her credibility fairly and impartially. Although they stated that they would be able to fairly render a verdict, the jurors were concerned about Lucas's presence in the courtroom, and, as the trial court found, the jurors felt "unnerved and intimidated." **Id.** at 4-5.

Further, the court did not err in finding less drastic alternatives were not available. The jurors could not fairly and impartially judge the credibility of Lucas. Such inability would have impacted Kennedy's decision as to whether to present her as a witness in his defense. Further, although most jurors stated they could fairly and impartially render a verdict, their statements establish that they were intimidated and nervous following the encounter. Due to this

intimidation and nervousness, it was not an abuse of discretion to conclude that they could not fairly render a verdict.

Order affirmed.

Judge Pellegrini joins the Opinion.

Judge Olson files a Concurring Opinion.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 08/27/2019