

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-24-00051-CR

———————————————————

EX PARTE ANTHONY JORDAN PATTERSON

On Appeal from the 297th District Court
Tarrant County, Texas
Trial Court No. 1749378

Before Sudderth, C.J.; Kerr and Walker, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

Appellant Anthony Jordan Patterson was tried for participating in a gang-related attack at a bar, but after a jury deliberated on his six alleged offenses for almost 20 hours, the trial court declared a mistrial sua sponte. Patterson now claims that his retrial is jeopardy-barred because the mistrial was not manifestly necessary.

But a trial court must be given plentiful discretion to evaluate the necessity of a mistrial, and here, the duration of the jury's unsuccessful deliberations had already exceeded the duration of the testimony, leading the trial court to reasonably conclude that—in light of the nature of the case—"it [was] altogether improbable that [the jury] c[ould] agree." Tex. Code Crim. Proc. Ann. art. 36.31. Because this decision was within the bounds of the trial court's discretion, we will affirm its denial of Patterson's petition for pretrial habeas relief.

## I. Background

During Patterson's jury trial, the State presented evidence of a gang-related attack on three men at a bar. The catalyst for the attack was a hat.

The hat-wearer—Christopher Johnson—went to a bar with his friends while wearing a red-and-black hat embroidered with the number 81. A group of bar patrons (one of whom was later identified as Nathaniel McCurdy)[1] perceived Johnson's hat as a sign of support for the Hell's Angels motorcycle gang, which was a

---

[1] *See McCurdy v. State*, No. 02-22-00264-CR, 2023 WL 5766052, at *1–12 (Tex. App.—Fort Worth Sept. 7, 2023, no pet.) (mem. op., not designated for publication).

rival to McCurdy's motorcycle gang, the Pagans. After several of the men in McCurdy's group confronted Johnson about the hat, Patterson snatched the hat off Johnson's head. Patterson later told the jury that he was not part of McCurdy's group and had been trying to defuse the situation. Either way, Johnson and his friend Ryan Lovett were pressured to leave the bar, and after they exited, another of Johnson's friends—Christopher Tomlin, who had driven Johnson to the bar—went out to the parking lot as well.

Then came the attack. As Johnson and Lovett were waiting by the passenger doors to Tomlin's vehicle, and as Tomlin was walking to the driver's side with his keys, McCurdy and several other men approached them. Tomlin was punched in the head and ribs before he was able to climb into the driver's seat of his vehicle. Lovett was thrown into the vehicle, and when he attempted to open the door to get out and help Johnson, the attackers cut his leg. Johnson, meanwhile, was stabbed in the back with a knife by McCurdy and later died.

The complainants were not familiar with their attackers and had trouble identifying them. Although the State presented surveillance videos from the bar, the video footage was low quality and the landscape dark, so the parties disputed what the videos showed.[2] Patterson claimed that he was not part of McCurdy's group, that he had not been one of the attackers, and that he had done nothing other than snatching

---

[2]The surveillance videos and other trial exhibits have not been included in the appellate record.

Johnson's hat inside the bar. The State, meanwhile, claimed that Patterson was a motorcycle-gang member, that the surveillance videos showed Patterson sitting with McCurdy's group inside the bar and assaulting Tomlin in the parking lot, and that Patterson was criminally responsible as a party to the attacks on Johnson and Lovett.

Patterson was indicted for six offenses, two for each of the complainants: (1) murdering Johnson, (2) engaging in organized criminal activity by committing that murder as a member of a criminal street gang, (3) committing aggravated assault with a deadly weapon against Tomlin, (4) engaging in organized criminal activity by committing that aggravated assault as a member of a criminal street gang, (5) committing aggravated assault with a deadly weapon against Lovett, and (6) engaging in organized criminal activity by committing that aggravated assault as a member of a criminal street gang.[3] The parties presented evidence on these alleged crimes for just under 16 hours, with the State calling more than 20 witnesses during that time and presenting hundreds of exhibits.[4] The jury then began deliberating.

Three days, six jury notes, and almost 20 hours of deliberation later, the jury still had not reached a verdict. The trial court noted on the record that the length of the jury's deliberations had "exceed[ed] the . . . hours of testimony that the jury [had]

---

[3]*Cf. id.* at *2–3 (noting McCurdy's indictment and trial for six similar counts).

[4]Patterson did not call any witnesses.

4

heard,"[5] and it concluded that "the jury ha[d] been kept together for such a time as to render it altogether improbable that it c[ould] agree." The trial court declared a mistrial sua sponte and later documented its decision in the minutes of the court.[6]

The State promptly reindicted Patterson. Facing the prospect of a retrial, he petitioned for habeas relief. He argued that his retrial violated the constitutional prohibitions on double jeopardy because the trial court's sua sponte mistrial had not been manifestly necessary. *See* U.S. Const. amend. V; Tex. Const. art. I, § 14. The trial court[7] denied relief.

## II. Law: Double Jeopardy and Mistrials

One component of a defendant's constitutional freedom from double jeopardy is his "right to have h[is] fate determined before the first trier of fact." *Ex parte Garrels*, 559 S.W.3d 517, 519 (Tex. Crim. App. 2018) (internal quotation marks omitted) (quoting *Torres v. State*, 614 S.W.2d 436, 441 (Tex. Crim. App. [Panel Op.] 1981)); *see Pierson v. State*, 426 S.W.3d 763, 769 (Tex. Crim. App. 2014) (noting that

---

[5]The trial court estimated that, by its calculations, "the jury [had] deliberated two hours on Monday, 8.5 hours on Tuesday, 8.5 hours on Wednesday, and . . . two additional hours [on the final day], bringing their deliberations . . . to 21 hours, which exceed[ed] the approximate[ly] 19 to 20 hours of testimony that the jury [had] heard." The benefit of a reporter's record reveals that the difference was even greater than the trial court realized. The presentation of evidence took less than 16 hours, and when the trial court declared a mistrial, the jury's deliberations were nearing their 20th hour.

[6]A week after the mistrial, Patterson filed a written objection.

[7]The original trial court recused itself, and the case was transferred to a new trial court, which ruled on Patterson's habeas petition.

constitutional protection includes the defendant's "right to have his trial completed by a particular tribunal" (quoting *Arizona v. Washington*, 434 U.S. 497, 503, 98 S. Ct. 824, 829 (1978))); *see also* U.S. Const. amend. V (stating that "[n]o person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb"); Tex. Const. art. I, § 14 (similar); Tex. Code Crim. Proc. Ann. art. 1.10 (similar). This right has limitations, though.

Although the prohibition on double jeopardy generally bars a defendant's reprosecution following a mistrial, it presents no such bar if there was a "manifest necessity" for the mistrial.[8] *Garrels*, 559 S.W.3d at 522. A manifest necessity exists only in "very extraordinary and striking circumstances." *Ex parte Fierro*, 79 S.W.3d 54, 56 (Tex. Crim. App. 2002) (describing manifest necessity as a "high degree" of necessity).

One such extraordinary circumstance "that has long been recognized is the trial judge's belief that the jury is genuinely deadlocked and unable to reach a verdict." *Ex parte Baezotero*, No. 03-07-00241-CR, 2008 WL 158761, at *2 (Tex. App.—Austin Jan. 17, 2008, no pet.) (mem. op., not designated for publication); *see Washington*, 434 U.S. at 509, 98 S. Ct. at 832 (referring to deadlocked jury as "the classic basis for a proper mistrial"); *Brown v. State*, 907 S.W.2d 835, 839 (Tex. Crim. App. 1995) (noting that

---

[8]Alternatively, a mistrial will not bar reprosecution if the defendant consents to the mistrial. *See Garrels*, 559 S.W.3d at 522. Here, the parties and trial court appear to agree that Patterson did not consent to the mistrial.

6

"[c]ircumstances in which the [Supreme] Court has found manifest necessity existed . . . have included . . . where a jury is unable to arrive at a verdict after considerable deliberation"). Thus, a trial court may, "in its discretion," discharge a jury and declare a mistrial if the jury "has been kept together for such time as to render it altogether improbable that it can agree." Tex. Code Crim. Proc. Ann. art. 36.31. Although a trial court must consider and rule out less drastic alternatives before it declares a mistrial on this basis, it need not expressly articulate its reasoning as long as the necessity for the mistrial is apparent from the record. *See Ex parte Garza*, 337 S.W.3d 903, 909–10 (Tex. Crim. App. 2011); *Brown*, 907 S.W.2d at 839–40.

A trial court's decision to declare a mistrial based on the jury's inability to reach a verdict is entitled to "great deference" and left to the trial court's "sound discretion." *Pierson*, 426 S.W.3d at 770, 774–75. We review that decision only to ensure that it was within the bounds of the trial court's discretion. *Id.* In determining whether a manifest necessity existed, we consider the amount of time the jury deliberated in light of the nature of the case, including the number of witnesses and exhibits, whether expert testimony was involved, the complexity of the charge, the complexity of the evidence, and the substance and number of jury notes.[9] *Beeman v. State*, 533 S.W.2d 799, 800 (Tex. Crim. App. 1976); *Ex parte Donison*, Nos. 02-17-

---

[9]When, as here, a defendant files a habeas petition based on a mistrial that he did not consent to, after he shows that he is being tried for the same offense, the burden shifts to the State to demonstrate manifest necessity. *Pierson*, 426 S.W.3d at 770; *Garza*, 337 S.W.3d at 909.

00100-CR, 02-17-00101-CR, 2017 WL 6947902, at *3 (Tex. App.—Fort Worth Oct. 19, 2017, no pet.) (mem. op., not designated for publication); *Ex parte McMillian*, No. 05-11-00642-CR, 2011 WL 3795727, at *2 (Tex. App.—Dallas Aug. 29, 2011, pet. ref'd) (not designated for publication).

## III.  Application:  Manifest Necessity for Mistrial

In Patterson's habeas petition, he argued that the trial court abused its discretion by declaring a mistrial because (1) despite the jury's lengthy deliberations, the mistrial was not manifestly necessary; and (2) "less drastic alternatives were never considered."  But the record reveals otherwise.

Granted, the jury could not have been expected to return a quick verdict in light of all it had to consider.  It heard testimony from more than 20 different witnesses, three of whom were experts,[10] and it was shown approximately 200 exhibits.

The jury charge was also somewhat lengthy.  Eight pages of jury instructions outlined Patterson's six alleged offenses plus two lesser-included offenses for the

---

[10]The State offered expert testimony from an intelligence operations specialist with the Bureau of Alcohol, Tobacco, Firearms, and Explosives, who testified regarding outlaw motorcycle gangs, the meaning of Johnson's hat, the rivalry between the Pagans and the Hells Angels, and the Pagans's association with another motorcycle gang, the Kinfolk.  The State also offered expert testimony from a gang intelligence officer, who described Texas gangs, the gang database, Patterson's membership in the Kinfolk at the time of the attack, and his subsequent affiliation with other motorcycle gangs, including the Pagans.  And it offered expert testimony from a forensic video analyst, who walked the jury through the surveillance videos, pointing out Patterson's location at key points.

counts related to Johnson's murder. And because Patterson was accused of participating in the attack as a party, the charge also instructed the jury on the law of parties.[11]

However, all of Patterson's alleged crimes traced to a single incident, and Patterson's primary defensive theory was the same for all six: he claimed that he had been merely sitting near McCurdy and his group at the bar, that he was not affiliated with that group, that he had not participated in the attack, and that the surveillance video was "a bunch of grainy pixels" that did not connect him to the crimes.[12] And while there were complexities regarding the specific gang that Patterson was allegedly a member of at the time of the incident,[13] the core dispute was still relatively

---

[11]The charge included instructions on the accomplice-witness rule, the role of voluntary intoxication, and the evidence of extraneous bad acts as well.

[12]Patterson also pointed out aspects of the State's theory of the case that, in his view, did not hold together. For example, there was testimony that the Kinfolk had splintered before the incident, so even if Patterson had once been a member, he argued that he could not have been a member at the time of the crimes. And even if the jury believed that Patterson had joined in attacking Tomlin, Patterson highlighted Tomlin's testimony that his injuries had been minor. Plus, he argued, it was undisputed that McCurdy—not Patterson—stabbed Johnson.

[13]There was testimony that Patterson was a documented member of the Kinfolk at the time of the attack, but there was also testimony that the Kinfolk had an internal rift in the months preceding the attack and that, although Kinfolk members had joined other groups, Patterson had not done so yet. Then, not long after the attack, Patterson was observed on social media wearing items that suggested he was associating with the Mongols motorcycle gang. More than two years later, he was documented as a member of the Pagans—McCurdy's motorcycle gang.

straightforward: was Patterson affiliated with McCurdy's group or not, and did he join in the attack or not?

Moreover, while there were over 20 witnesses, generally, the scope of each witness's testimony was narrow, so the average length of testimony was relatively brief. Similarly, more than half of the approximately 200 exhibits offered by the State were photographs that were entered into evidence in large batches and did not require lingering contemplation.[14] From the time the State called its first witness to the time the parties closed their cases, the jury heard less than 16 hours of evidence.

Yet, it deliberated for almost 20 hours over four days with no resolution. During that time, it sent out six notes, the last two of which expressly stated that there were internal disagreements regarding specific aspects of the evidence. *Cf. McMillian*, 2011 WL 3795727, at *3–4 (holding manifest necessity existed when jury sent out multiple jury notes indicating deadlock); *Ex parte Perusquia*, 336 S.W.3d 270, 276–77 (Tex. App.—San Antonio 2010, pet. ref'd) (similar).

And while Patterson contends that the trial court failed to consider any less drastic alternatives before declaring a mistrial, the record shows that the trial court not only considered but repeatedly employed one alternative in particular: allowing the jury to break for the day and return to deliberations the next morning. *See Donison*, 2017 WL 6947902, at *4 (holding manifest necessity supported mistrial and listing

---

[14]The photographs have not been included in the appellate record.

alternatives employed by trial court, including that it "allowed the jury to recess and resume deliberations the following day"); *Shook v. State*, No. 2-06-187-CR, 2007 WL 1776069, at *6–7 (Tex. App.—Fort Worth June 21, 2007, pet. ref'd) (mem. op., not designated for publication) (holding mistrial was not abuse of discretion when trial court considered alternative of dismissing the jurors for the night but appellant objected).  By the time the trial court declared a mistrial, the jury had been given three overnight breaks and still had not come to an agreement.

True, the trial court did not expressly enunciate its consideration of every other less drastic alternative that Patterson proposed after the fact in his habeas petition. But it was not required to expressly enunciate its reasons for ruling out such alternatives—particularly when, as here, the record shows that it could have reasonably done so.  *See Brown*, 907 S.W.2d at 840 (recognizing that trial court may "implicitly rule out a less drastic alternative").

For example, Patterson questions the trial court's failure to issue an *Allen* charge as an alternative to a mistrial,[15] but such a supplemental charge is not appropriate in every case.  An *Allen* charge is issued "to a jury that declares itself deadlocked" and is designed to "emphasize[] the importance of reaching a verdict." *Traylor v. State*, 567 S.W.3d 741, 744 (Tex. Crim. App. 2018); *Barnett v. State*, 189 S.W.3d 272, 277 n.13 (Tex. Crim. App. 2006); *see Hill v. State*, No. 02-11-00017-CR,

---

[15]The *Allen* charge takes its name from the United States Supreme Court case *Allen v. United States*, 164 U.S. 492, 17 S. Ct. 154 (1896).

11

2011 WL 5247889, at *2 (Tex. App.—Fort Worth Nov. 3, 2011, pet. ref'd) (mem. op., not designated for publication). In this case, the jury had been deliberating for almost 20 hours, and despite its apparent impasse, it had not surrendered to the deadlock and was continuing to try to reach an agreement. Nothing in the record indicates that the jury had prematurely declared itself deadlocked or that it needed to be reminded of "the importance of reaching a verdict." *Traylor*, 567 S.W.3d at 744 & n.14. So while the trial court may not have discussed this less drastic alternative on the record, it was within its discretion to implicitly conclude that an *Allen* charge was not appropriate. *See Ex parte Booker*, No. 10-14-00369-CR, 2015 WL 1211282, at *1–2 (Tex. App.—Waco Mar. 12, 2015, pet. ref'd) (mem. op., not designated for publication) (holding trial court did not abuse discretion by declaring mistrial based on jury deadlock despite trial court's rejection of defendant's request for *Allen* charge); *cf. Washington*, 434 U.S. at 509–10, 98 S. Ct. at 832 (noting that, when jury is deadlocked "after protracted and exhausting deliberations, there exists a significant risk that a verdict may result from pressures inherent in the situation" and that if trial court lacks the discretion to declare a mistrial, it might be motivated to "employ coercive means to break the apparent deadlock"); *Thetford v. State*, No. 02-18-00488-CR, 2021 WL 278913, at *14 (Tex. App.—Fort Worth Jan. 28, 2021) (mem. op., not designated for publication) (listing factors relevant to determining if *Allen* charge is coercive, including the length of deliberations prior to the *Allen* charge and whether the jury is required to endure marathon deliberations), *rev'd in part on other grounds*, No. PD-0258-

12

21, 2021 WL 2674484 (Tex. Crim. App. June 30, 2021) (not designated for publication).

Given the single incident underlying all six crimes alleged, the relatively straightforward nature of the core disputed issues, the two jury notes indicating disputes, the less-than-16 hours taken to present evidence, and the numerous overnight jury breaks, the trial court was within the generous bounds of it discretion to conclude that—as the jury's deliberations neared their 20th hour—the jury "ha[d] been kept together for such time as to render it altogether improbable that it c[ould] agree." Tex. Code Crim. Proc. Ann. art. 36.31. This is a "classic basis for a proper mistrial," *Washington*, 434 U.S. at 509, 98 S. Ct. at 832; *Traylor*, 567 S.W.3d at 744, and in the circumstances of this case, it constituted a manifest necessity. *Cf. Munguia v. State*, 603 S.W.2d 876, 878 (Tex. Crim. App. [Panel Op.] 1980) (holding mistrial was not abuse of discretion when "the presentation of the evidence consumed a total of five and a half hours with the jury deliberating for three hours" and the jury indicated deadlock); *Patterson v. State*, 598 S.W.2d 265, 268 (Tex. Crim. App. [Panel Op.] 1980) (holding mistrial was not abuse of discretion when "the presentation of the evidence took less than one day" and the jury "deliberated for over four hours" and indicated deadlock); *Satterwhite v. State*, 505 S.W.2d 870, 872 (Tex. Crim. App. 1974) (holding mistrial was not abuse of discretion because "the jury deliberated three times as long as was required to present the evidence"); *Shook*, 2007 WL 1776069, at *6–7 (holding mistrial was not abuse of discretion when jury heard four hours of testimony and

13

deliberated for almost seven hours); *Husain v. State*, 161 S.W.3d 642, 646–47 (Tex. App.—San Antonio 2005, pet. ref'd) (holding mistrial was not abuse of discretion when trial lasted two-and-a-half days and jury deliberated approximately 16 hours).

## IV. Conclusion

Because a mistrial does not bar a defendant's retrial when, as here, the record shows that the mistrial was manifestly necessary, we affirm the trial court's denial of Patterson's petition for habeas relief. *See* Tex. R. App. P. 43.2(a).

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: March 21, 2024

14